UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| United States *ex rel*. | ) | Civil Action No._____ |
| | ) | |
| Thomas O'Neil Morgan | ) | Complaint and Jury Demand |
| 201 Donmore Drive, | ) | |
| Great Falls, VA 220661, | ) | |
| | ) | Date Received_____ |
| | ) | |
| | ) | Complaint filed |
| | ) | **Under Seal** pursuant to 31 |
| | ) | U.S.C. §3730(b)(2) |
| BRINGING THIS ACTION ON BEHALF | ) | |
| OF THE UNITED STATES OF AMERICA | ) | |
| | ) | |
| c/o | ) | |
| The United States Attorney | ) | |
| Judiciary Center Building, | ) | |
| 555 Fourth Street, NW, | ) | |
| Washington, 20530 | ) | _____ |
| | ) | United States District Court |
| and | ) | |
| | ) | |
| c/o | ) | |
| The Attorney General of the United States | ) | |
| U.S. Department of Justice | ) | |
| 10th and Constitution Avenues, N.W. | ) | |
| Washington, DC 20530 | ) | |
| | ) | |
| vs. | ) | |
| | ) | |
| Defendants, | ) | |
| SCIENCE APPLICATIONS | ) | |
| INTERNATIONAL | ) | |
| COMPANY | ) | |
| Suite 300 | ) | |
| 1120 Vermont Avenue, NW | ) | |
| Washington, DC 20005 | ) | |
| | ) | |
| SPARTA, INC., | ) | |
| Suite 1100 | ) | |
| 1911, N. Fort Myer Drive, | | |
| Arlington, VA 22209 | | |

## COMPLAINT

This is a *qui tam* action under 31 U.S.C. Sec. 3729, *et seq.* of the False Claims Act filed by Relator/Plaintiff Thomas O'Neil Morgan, in the name of the United States Government and himself to recover penalties and damages arising from Defendants' violations of federal requirements concerning contracts with agencies of the United States Defense Department, specifically the Missile Defense Agency.

## THE PARTIES INVOLVED

1.    Plaintiff, Thomas O'Neil Morgan, age 51, of 201 Donmore Drive, Great Falls, VA 22066, is a former Senior Scientist hired by SAIC (See Below) who served as a member of the Black Team of the Missile Defense Agency. He was hired and paid as an SAIC employee and is not a member of the Armed Forces of the U.S. Mr. Morgan has extensive experience consulting in the defense industry.

2.    Defendant, Science Applications International Corporation, of 1120 Vermont Ave, NW Washington, DC 20005 (hereinafter "SAIC") is a company, which is "essentially employee owned" according to its most recent filings with the Securities and Exchange Commission.  The company employed Mr. Morgan pursuant to contracts it maintained with the Missile Defense Agency.

3.    Defendant SPARTA, Inc. of 19111N. Fort Meyer Dr. Arlington, Virginia 22209, is a systems engineering and advanced technology company, which also provided workers to the Missile Defense Agency during Mr. Morgan's tenure.

## JURISDICTION AND VENUE

4.    Plaintiff, Thomas O'Neil Morgan, hereby alleges causes of action under 31 U.S.C. sections 3729 *et. al.* of the False Claims Act, arising from Defendants' contracts with agencies of the United States Government Defense Department specifically the Missile Defense Agency.

5.    Plaintiff, Thomas O'Neill Morgan is the original source of all the allegations contained in this complaint.

6.    There has been no public disclosure of the allegations contained in this complaint.

7.    On December 23, 2004, Thomas O'Neill Morgan filed a "Protest and Complaint of Contractual and Scientific Fraud" with the Missile Defense Agency, General Counsel containing substantially all the allegations included herein.  He has also filed a Relator's Disclosure Statement with the Department of Justice.

8.    Jurisdiction over all stated causes of action is conferred upon this Court by 31 U.S.C. Section 3732 and 28 U.S.C. Section 1331 in that this action arises under the laws of the United States.

9.    The Defendants are in the business of providing services and material to the U.S. Government and conduct business in Washington, DC.

10.    Defendant, SAIC's corporate filings indicate that the company maintains offices in a majority of U.S. States and its website lists several offices in the District of Columbia including 1120 Vermont, Avenue, NW Washington, DC 20005.

11.    Defendant SPARTA, Inc. Maintains offices in several locations in the United States including, 1911, N. Fort Myer Drive St1100 Arlington, VA 22209 and conducts business with Agencies of the U.S. Government in Washington, DC.

12.    The Missile Defense Agency ("MDA") maintains a mailing address at 7100 Defense Pentagon, Washington, DC 20301-7100 and each of the defendants as well as the plaintiff did business with the MDA in contracts as part of this case.

13.    Venue and jurisdiction are proper in the United States District Court, Washington, D.C. pursuant to 28 U.S.C. Section 1391(c) and 31 U.S.C. Section 3732 as the defendants are a group of organizations and persons subject to personal jurisdiction in Washington, DC.

## STATEMENT OF FACTS:

### Introduction

14.    The allegations contained in paragraphs 1-13 are hereby re-alleged and set forth fully as above.

15.    Mr. Morgan was hired by SAIC to provide the government with budgetary and technical expertise based on his more than twenty years of post doctorate experience in missile defense.

16.    The Missile Defense Agency organizes technical expertise around several color-coded working groups and hires outside experts to staff these teams.

17.    The Black Team was organized to provide guidance with regard to allocating resources and determining how to handle problems in missile defense technology.

18.    The Black Team interacted with other color coded teams, but only one team was more senior, in terms of engineering and technical expertise, namely the White Team.

19.    Team engineers and scientists are charged with the most sensitive and important scientific work for the MDA.

20.    The qualifications generally required to serve on the senior color-coded team positions include significant *post doctorate* career experience.

21.    The White Team alone includes two Nobel Laureates, one retired four star general who formerly served as the Air Force Chief of Staff, one former Chief Executive of Lockheed Martin, and one former Assistant Secretary of Defense, among other consultants.

22.    The plaintiff, Thomas Morgan, was hired to serve as liaison between the Black Team and the Government.

23.    In this capacity, Morgan discovered that SAIC and SPARTA supervisors were primarily concerned with securing business and using contract funds to benefit their companies, often at the expense of fulfilling the companies' obligations to the Government.

24.    SAIC and SPARTA engaged in business practices that were fraudulent in the inducement of contracts, restrained trade, created additional expenses and compromised the intellectual and technical credibility of the Missile Defense Agency.

25.    On information and belief, SAIC and SPARTA acted in a similar manner with regard to all their work connected to the Missile Defense Agency, in addition to the specific contracts and budgets on which the plaintiff worked directly.

26.    The plaintiff has reason to believe that SAIC conducts business in this manner with many other defense agencies of the United States Government.

27.    When Mr. Morgan confronted his superiors at SAIC with what he felt were violations of Federal Acquisition Regulations, improper contracting procedures, as well as demonstrably poor scientific products, his complaints were ignored, then he was harassed, and finally he was fired.

28.    SAIC placed him under guard and "frog marched" Mr. Morgan from his office, while taking control of his computer.

29.    Many of the technical issues Morgan worked on at the time he was fired are ongoing at the MDA and must be resolved to prevent further waste.

30.    While the contracts for personnel in the color-coded teams within the MDA total some $12.4 million dollars annually, that figure is trivial compared with the full impact of the damages caused by the defendants' business practices.

31.    The Color Coded Teams are designed and staffed by the most senior scientists in their field.

32.    The MDA relies on their work to plan procurement and tests of MDA systems and programs.

33.    A single test of a missile program can cost approximately $250 million.

34.    Procurement is likewise extremely costly.

35.    The person years required to fix inferior science is also expensive.

36.     SAIC and SPARTA, in order to advance their own business interests in the MDA and the defense industry, compromised the quality of the scientific work that directs these activities.

37.     The plaintiff provides four specific examples, in which the defendants' business priority led to their production of incorrect scientific work. (*See Section K.*)

38.     This is scientific work upon which the MDA must rely in order to plan procurement and conduct tests of programs.

39.     The plaintiff also provides examples of the defendants, exercising government budgetary authority that they legally did not have in order to increase the size of their own contracts, hiring junior engineers to handle senior scientific responsibilities, deliberately assigning "make- work" projects or incorrect work to scientists specifically to deplete contract funds, and obtaining contracts by using resumes of personnel they knew would not be available, among other fraudulent activities.  (*See* Sections B, C, F and G.*)

40.     In the process the defendants forced scientists to submit false time cards and expenses.

41.     In one egregious example, a senior scientist and expert on sensor data was assigned to read a college level text book on a different subject, radar systems.

42.     SAIC's manager ordered this wasteful exercise in the vain hope to create Radar expertise specifically for the benefit of the contractor, rather than the government.

43.     The MDA budget already included funds for internationally recognized radar experts.

44.     The consultant was forced to bill the Black Team account under which he had been hired to handle sensor data, for his time to read the radar text book.  (*See* Section I.)

45.     Time is of the essence in this matter.

46.     The business practices, described throughout this complaint, are ongoing and continue to compromise the work of the color-coded teams.

47.     They constitute a continuing threat to cost the Missile Defense Agency hundreds millions of dollars in program funds, procurement outlays, wasted tests and hours of scientific time.

48.     The plaintiff, has also been personally damaged to the extent that his reputation and income have been affected and he has been humiliated by SAIC's actions.

49.     As a scientific expert, and technical advisor for government contractors in the middle of a distinguished career, this firing places a special burden on Mr. Morgan.

50.     It damages his ability to obtain additional consulting work. Mr. Morgan must now disclose information about this firing on any form required for government security clearances.

51.     Virtually any position Mr. Morgan would pursue as an expert in technology regarding defense issues would require such security clearance.

**A. Background on Contract Agreements Between SAIC, SPARTA and the**

**Missile Defense Agency**

52.     The allegations contained in Paragraphs 1-51 are hereby re-alleged and set forth fully as above.

53.  Mr. Morgan was initially hired by SAIC in its capacity as a sub-contractor to SPRATA on two contracts namely the TSES (Threat System Engineering Support) contract, Reference Number HQ0006-05-Q-0001 and a contract for the Black Team which is believed to be titled SE 99-C-0008, but that number can not be confirmed at this time.

54.  Morgan was later prevented from charging against the TSES contract. (*See* Section E)

55.  Those two contracts, put very different duties and responsibilities on the personnel fulfilling them.

56.  Black Team members were supposed to be among the most highly trained professionals working on Missile Defense Agency projects, while those working on the TSES contract need not necessarily have such training and experience.

57.  As part of the prime/sub relationship SAIC represents that it has the talent needed to fill positions, when SPARTA may not be able to do so.

58.  Thomas Morgan was recruited by SAIC and reported directly to SAIC's Area Manager, Bien Vu.

59.  The Missile Defense Agency uses an organizational structure composed of various color-coded teams to review performance and specify hardware for government acquisition.

60.  Thomas Morgan had direct experience with SAIC and SPARTA officials who used the Black Team Budget and other budgets for the benefit of their companies at the expense of the Missile Defense Agency.

61.    A third contract, held by SPARTA, is implicated because of the decision by SPARTA and SAIC to send David Beerman to at least one meeting, which was assigned to Morgan by the appropriate Government officer. (*See* Section E.)

62.    A fourth contract is implicated by Morgan's work for the Defense Intelligence Agency through an SAIC contract as the Subcontractor to another defense contractor BAE Systems.  In this instance Morgan was told to present his former client with a much lower expense rate than, on information and belief, SAIC charged.  (*See* Section H.)

**B. Black Team Budget Prepared for SAIC's Benefit.**

63.    The allegations contained in paragraphs 1-62 are hereby re-alleged and fully set forth as above.

64.    Thomas Morgan began his duties as an SAIC employee on May 17, 2004.

65.    In July of 2004 after approximately two months of work and study related to Black Team operations, Morgan met with Bien Vu, as well as Dennis Nihiser, the Government contracting authority for the color-coded teams and Paul Krause, who acted as Nihiser's Deputy and Budget Manager.

66.    At this meeting, Dennis Nihiser verbally assigned Morgan the duties of Black Team Administrative Lead.

67.    Initially, Morgan believed Paul Krause was a government employee.

68.    Morgan did not learn that Mr. Krause was actually an employee of SAIC for another two months.

69.    Bien Vu told Morgan that Mr. Krause had authority to distribute and disburse Government funds for all of the color-coded teams on behalf of the government.

70. These contracts have a value of approximately $12.4 million per year as stated above.

71. Mr. Krause, as an SAIC employee, had no such authority.

72. After receiving his new assignment, Morgan met Vu and Krause to discuss the color-coded teams' budgets.

73. Krause began the meeting by handing Vu a sheet of paper with his proposed budgets.

74. Krause's proposal included line items for each of the contracting organizations then working within the Missile Defense Agency for the Black Team, as well as government sponsored work at federally funded research and development centers (FFRDCs).

75. The draft budget sheet Krause gave Vu set aside government funds for several full time employees at SAIC.

76. Krause indicated that Morgan was to use these estimates and prepare the budget submission, under Morgan's authority as the administrative lead.

77. The budget sheet listed pricing details and the exact amount of money to be disbursed to each contracting organization.

78. The amount to be distributed to SAIC was on the sheet before a justification for the positions had been established.

79. Following standard government contracting procedure for planning budgetary allotments, Morgan met with members of the Black Team.

80.    Morgan met with Alan Jessup, Keith Holland and Mark Pesses who was later hired by SAIC and Maile Fries of the Institute for Defense Analyses (IDA), to determine the Team's technical needs and discuss past Black Team funding.

81.    Based on their recommendations, and his own experience, Morgan prepared the first draft of the budget and submitted that to Bien Vu.

82.    Mr. Vu immediately rejected this version of the budget.

83.    Mr. Vu stated that the budget did not agree with his view of the required technical disciplines and it differed in the funds Morgan made available to SAIC in comparison with the original version created by Paul Krause.

84.    Morgan redrafted the budget making specific references to specific disciplines that he felt the Black Team needed as justification for the reallocation of funds.

85.    Vu rejected this second submission from Morgan and told Morgan that Morgan had no discretion in determining the needs of the Black Team.

86.    Vu told Morgan to use the funds exactly as allocated by Krause.

87.    This order from Vu of SAIC was in direct contradiction with Mr. Morgan's understanding of his role as stated by the government employee in charge, Dennis Nihiser.

88.    Morgan prepared a description of the jobs to be filled as part of his budget proposal.

89.    Mr. Vu also rewrote these descriptions.

90.    In Vu's edited description, 2.3 man years of allocations were no longer identified as going to SAIC employees, but were now labeled "TSES Support, Various."

91.   This is the description that appears in the final Black Team budget, despite the fact the money was still earmarked for SAIC and its employees.

92.   The Black Team Budget includes names and descriptions for every other line item.

93.   Bien Vu ordered Morgan to send Vu's version of the budget to Krause.

94.   Morgan was still acting under the belief that Krause was a government, and not an SAIC, employee.

95.   Even though Morgan felt the allocation was not properly stated, Morgan wanted to comply with what he thought were the Missile Defense Agency priorities.

96.   When Morgan finished all the changes that Vu demanded, Vu became solicitious that Morgan transmit the result directly to Krause from Morgan's email.

97.   Vu did not send it on his own to Krause though Morgan suggested it.

98.   This identified the work as Morgan's rather than Krause's or Vu's based on the return address of the email submission.

99.   Morgan did submit this budget to Krause, because Morgan believed Krause's indication about budget allocations reflected government wishes.

100.  In fact, Krause, as an SAIC employee, did not have the authority to reflect government wishes on the matter.

101.  Krause and Vu had successfully forced Morgan into appearing to support their version of the budget.

102.  This was the only purpose Krause could have had in requiring a draft budget he created, in effect, be re-submitted to him by Vu and Morgan.

103.    This appearance allowed SAIC greater persuasive authority with the government as to the propriety of the budget.

104.    The budget was not changed in any material way by the Missile Defense Agency.

105.    SAIC and SPARTA were also able to use their corporate relationship to mutual advantage in this project.

106.    On information and belief, SPARTA as the prime contractor, received approximately 7%, in profit, to administer the Black Team Contracts.

107.    SPARTA also received other management payments, and in a budget delivered after Morgan's departure, SPARTA's prime contract manager, David Beerman, became a Black Team member.

108.    This arrangement allowed SAIC and SPARTA to profit from the expenses related to this contract, even while making it appear as if the sub and prime contractors were not directing the budget process.

109.    In fact, Krause and Vu directed that process to steer business to SAIC and SPARTA.

110.    Two months after being directed to submit the Black Team Budget, Morgan learned Krause was actually an SAIC employee working in a special arrangement and sitting in on government planning meetings.

111.    Morgan asked Bien Vu why Krause's true affiliation had been hidden.

112.    Vu stated SAIC does not like to advertise the fact that it has its own employees acting in Advisory and Assistance roles within the MDA.

113.    Both Vu and Krause, therefore, acted to subvert control of the Black Team Budget from proper governmental authority, created the entire budget to benefit

their employers over the needs of the MDA and used Morgan's reputation specifically to benefit the needs of the companies over the needs of the Missile Defense Agency.

114. Vu and Krause as officers of SAIC acted to induce contracts by fraudulently representing their roles in the MDA and misrepresenting their advice.

115. The full value of the contracts obtained by SAIC and SPARTA for the Black Team Budget are approximately $2.825 million per year.

116. Such obsession with obtaining contracts puts at risk the scientific product created for The Missile Defense Agency.

117. Such work compromised MDA programs including testing and procurement.

118. In addition to the fact that SAIC knowingly, willfully and recklessly created the budget to defraud the Missile Defense Agency, it also acted in direct violation of several provisions of the Federal Acquisition Regulations (FAR).

119. For example, the regulations defining inherently governmental functions were violated.

120. The FAR defines inherently governmental activity under subpart 2.101 as:

> (1) An inherently governmental function involves, among other things, the interpretation and execution of the laws of the United States so as to—
>
> (i) Bind the United States to take or not to take some action by contract, policy, regulation, authorization, order, or otherwise; …
> (v) Exert ultimate control over the acquisition, use, or disposition of the property, real or personal, tangible or intangible, of the United States, including the collection, control, or disbursement of Federal funds.

121. FAR Subpart 7.503 states inherently governmental functions are:

> (c) The following is a list of examples of functions considered to be inherently governmental functions or which shall be treated as such. This

list is not all inclusive:…

(6) The determination of Federal program priorities for budget requests…

(12) In Federal procurement activities with respect to prime contracts—

(i) Determining what supplies or services are to be acquired by the Government (although an agency may give contractors authority to acquire supplies at prices within specified ranges and subject to other reasonable conditions deemed appropriate by the agency); …

(iii) Approving any contractual documents, to include documents defining requirements, incentive plans, and evaluation criteria;

(iv) Awarding contracts;

(v) Administering contracts (including ordering changes in contract performance or contract quantities, taking action based on evaluations of contractor performance, and accepting or rejecting contractor products or services);

(vi) Terminating contracts;

(vii) Determining whether contract costs are reasonable, allocable, and allowable; and …

(16) The determination of budget policy, guidance, and strategy.

122.    Bien Vu and Paul Krause's representation that Krause was able to disburse and distribute funds of the Missile Defense Agency is an usurpation of inherently governmental authority as defined in the above referenced provisions.

123.    Krause and Vu's ability to exercise control over the creation of the Black Team budget also represents a violation of inherently governmental authority.

124.    The FAR reserves authority for awarding contracts, and administering authority over budgets to the Government, as referenced above.

125.    The FAR also generally probibits bid information from being released to individual contractors as follows:

3.104-4. Disclosure, protection, and marking of contractor bid or proposal information and source selection information.

(a) Except as specifically provided for in this subsection, no person or other entity may disclose contractor bid or proposal information or source selection information to any person other than a person authorized, in

accordance with applicable agency regulations or procedures, by the agency head or the contracting officer to receive such information.

(b) Contractor bid or proposal information and source selection information must be protected from unauthorized disclosure in accordance with 14.401, 15.207, applicable law, and agency regulations.

126. SAIC and SPARTA continually worked to circumvent this prohibition.

127. They acted from the inside the contract process to create the Black Team Budget.

128. The cost projections contained in the Black Team budget submission provided SAIC and SPARTA with contracting information about the allocations the MDA intended to make for upcoming services prior to the proposal that SAIC and SPARTA would submit to continue this work (the "recompete").

129. This information was not available to any other parties, and in effect SAIC and Sparta created the information in the first place.

### C. Black Team Budget Prepared by SAIC Conceals

### Less Qualified Personnel Working for SAIC

130. The allegations set forth in paragraphs 1-129 are hereby re-alleged and set forth fully as above.

131. As detailed above, SAIC officials created the Black Team Budget to benefit SAIC.

132. One such benefit was the line item "Various" under "TSES Support" which concealed the qualifications of employees who were billed to the government as senior engineers.

133. The engineers who billed against this line item did not have such credentials, experience or ability.

134.    By contrast, each of the named individuals in the budget has advanced engineering degrees and/or significant experience in Missile Defense issues.

135.    With the possible exception of Bruce Haselman, all members of the Black Team had been accepted and were working based on these credentials.  (*See* Section D. below on Mr. Haselman's contract).

136.    Senior advisors on Missile technology for the Missile Defense Agency, generally have significant *post doctorate* experience in the field.

137.    The Black Team acts as a senior advisory body. As a result it has high salary allocations.

138.    Each line item costs the government at least $250,000 per year.

139.    To fill these positions, a senior engineer or scientist should be hired through interview and by submission of qualifications to the MDA.

140.    However, SAIC was able to use the designation "Various" under TSES Technical Support in the Black Team Budget to use junior (far less qualified) personnel.

141.    Junior engineers cost SAIC significantly less in salary and benefits.

142.    SAIC made no adjustments in billing costs to the Missile Defense Agency for using less costly personnel in these positions.

143.    SAIC continued to bill time for these engineers based on rates established for more senior engineers.

144.    The "Various" line item in the budget covered 2.3 full time employees giving SAIC the ability to charge a total of $575,000 per year for services provided by various junior SAIC employees including David Spetman, Chris Nielson, Chris Gordon, Keith Holland.

145. SAIC was also able to control the fact that its employees would fill these positions.

146. The budget document did not specify that the "Various" money had to go to named parties, organizations or affiliations which are routinely drawn on to perform government science analyses.

147. These positions could be filled, in effect, at SAIC's discretion, by its own engineers.

148. By creating the description "Various" and obtaining the budget approval it designed, SAIC prevented other contractors from competing for this line item.

149. The contract that funded the Black Team was actually a SPARTA prime contract passed through to SAIC as the Subcontractor.

150. Once SAIC got the budget approved for the Black Team, they had complete discretion over the use of this line item.

151. SAIC and SPARTA knowingly, willfully and recklessly acted to conceal the qualifications of consultants it employed and to collect high rates for those consultants.

152. The full value of this line item in the Black Team budget of $575,000 per year.

153. The United States has also been damaged to the extent that any of the work product created as a result of inexperienced staff or improper assignment of duties to those not qualified to perform them, must be redone in order to fix errors.

154. The United States has also been damaged to the extent that such inferior work compromised other MDA programs including testing and procurement.

155. These actions by the Defendants also violated several provisions of the FAR.

156.    For example, SAIC's control of these positions and its ability to allocate budget funds to hire three of its own employees create additional violations of the FAR regulations on inherently governmental authority. (Sections 2.101 and 7.503 as cited above.)

**D. SAIC Pressures Bruce Haselman to Accept Employment from**

**SAIC under Black Team Budget**

157.    The allegations set forth in paragraphs 1-156 are hereby re-alleged and set forth fully as above.

158.    When Bien Vu first asked Morgan to amend the Black Team project budget submission, Morgan noticed that it included a billing rate of $350,000 per year for Bruce Haselman.

159.    This was a high rate even when compared to other commercial members of the Black Team.

160.    Morgan initially thought the rate was a mistake and changed it to $250,000 in his draft budget submission.

161.    Bien Vu changed the rate back to $350,000.

162.    Vu stated that Haselman required the $350,000 rate, because Haselman was a consultant to Northrop Grumman and Northrop Grumman would not accept less.

163.    Bruce Haselman contradicted this in a private meeting with Morgan.

164.    Haselman claimed that he intended to consult part time for the Black Team and that his rate to Northrop Grumman was actually fairly low.

165.    Haselman said he was looking for an interesting outlet during his retirement.

166. Paul Krause told Vu and Morgan that Dennis Nihiser had specifically requested Haselman's services.

167. Dennis Nihiser was an official of the Missile Defense Agency and by invoking his authority, Mr. Krause was able to ensure that Haselman's line item would be included in budgets for the Black Team.

168. Upon approval of the Black Team budget, Vu moved to pressure Haselman to start work for SAIC instead of Northrop Grumman.

169. After he recognized that the MDA specifically requested Haselman's services, Vu moved systematically to make it possible for SAIC to obtain another consultant contract, through which it could bill the Missile Defense Agency and collect the overhead for such services.

170. With Haselman at Northrop Grumman, SAIC stood to gain nothing from the typical support services burden it charges the US Government for labor and the Black Team budget allocation for Haselman would have simply been a pass-through to Northrop Grumman.

171. Vu and Krause were able to convince Haselman that they were in control of the Black Team budget.

172. Their ability to persuade Haselman was bolstered by the fact that they did exercise considerable control over the budget despite FAR provisions, and government authority, which should have prevented them from determining the allocation of funds to various contractors.

173. They led Haselman to believe that if he wanted to work at the Missile Defense Agency, he should work for SAIC.

174.    The budget for the Black Team was approved to include a line item that was designed specifically for Haselman.

175.    SAIC's managers convinced Haselman to work for SAIC.

176.    So, only one step remained for the company to take full advantage of the situation: SAIC had to hire Haselman.

177.    Therefore, Bien Vu worked with SAIC Program Manager Lee Phillips at SAIC's corporate headquarters to facilitate Haselman's hiring as an employee for SAIC.

178.    Lee Phillips approved an employment advertisement to be placed on the SAIC web site for a candidate matching Haselman's résumé.

179.    Vu told Morgan the advertisement provided a set-aside job for Haselman and that Morgan should prepare to work Haselman in to the Black Team duties.

180.    SAIC posted that advertisement as an equal opportunity position, but it was for Haselman only, and, of course, Haselman was hired.

181.    SAIC as a government contractor, makes this representation of equal opportunity employment on virtually all of the public statements when it advertises for hiring purposes.

182.    Confirmation that this job was set aside for Haselman came from an unexpected source.

183.    Another SAIC Black Team member, Mark Pesses saw the public posting and felt it coincided closely with his existing duties.

184.    Vu had repeatedly denigrated Pesses and the value of Pesses' work.

185.    As a result, Mark Pesses grew depressed and thought he was being fired.

186.    Pesses asked both Morgan and Vu about the SAIC job posting.

187.  Vu told Pesses the advertisement was only a formality to bring Haselman into
      SAIC as directed by Lee Phillips.

188.  Mark Pesses, therefore provided confirmation to Morgan that the advertisement
      was solely to facilitate SAIC's hiring of Bruce Haselman.

189.  In addition, Bien Vu told Morgan that Haselman provided no unique skills for
      Missile Defense analysis beyond some hardware design he had performed several
      years earlier.

190.  This contradicted Vu's representations on behalf of SAIC to the Government.

191.  To support Haselman's high overhead costs, Vu made representations to the
      Government that Haselman was uniquely suited to the work.

192.  In fact, of course, SAIC never seriously considered any other candidate for this
      position and there was never any attempt to open up the position to any type of
      competitive process or opportunity for any other prospective employee.

193.  Morgan didn't interview any candidates, for instance, as he had done when Pesses
      began on the Black Team.

194.  If SAIC had forwarded any competitors to Haselman for this job, it would have
      been Morgan's obligation to interview them and evaluate their qualifications.

195.  SAIC now had budget authority to charge the government the $350,000 per year
      rate for Haselman's time, when it had originally bid, and was only authorized to
      charge the government $250,000 for each commercial Black Team member.

196.  There were other positions included in the budget with rates as high as $300,000
      per year, but these were for employees of Federally Funded Research and
      Development Centers, which are quasi-government entities that are specifically

allowed to charge a higher rate, and are not subjected to competitive bid with commercial entities.

197. Mr. Hasselman was initially hired as a consultant from a commercial vendor, Northrop Grumman, and his annual rate even exceeded that of the Federally Funded Research and Development Center personnel.

198. Haselman's contract now also gave SAIC four full time employees out of six in the senior leadership of the Black Team.

199. Only Maile Fries of the Institute of Defense Analyses and Mike Hankamer of the Office of Naval Research held positions in the senior most leadership, or "core", of the Black Team.

200. On the other hand, Morgan, Pesses, Vu and now Haselman, all from SAIC, constituted the remainder of the six-member "core".

201. SAIC thus had a majority over the personnel on the Black team to influence proposals and suggestions for new topics and analyses that the Black Team would perform in the future.

202. These proposals could be tailored to uniquely use the talents at SAIC at the expense of other contributors in the "support" role to the team.

203. Haselman's particular career needs meant SAIC could also keep more of the overhead for his services than a normal employee.

204. Haselman, at 67, qualified for Medicare and required no insurance or additional benefits.

205.  SAIC was able to reap additional rewards from his contract, because SAIC charges the government a fixed multiple of a salary, which includes the overhead burden of insurance and other benefits.

206.  Vu never changed the funding line for Haselman, which had originally been set at the high level to cover pass-through costs to Northrop Grumman.

207.  Those costs no longer existed.

208.  Vu knew the exact amount that a contractor could bill the government for Black Team members, and he knew that this budget line was set up specifically for Haselman.

209.  By hiring Haselman, Vu prevented any other contractor from obtaining this individual, and, in effect, prevented other companies from hiring him in competition for the Black Team contract.

210.  Dennis Nihiser in his capacity as an official of the Missile Defense Agency, had singled out Haselman, as an indispensable member of the color-coded teams.

211.  Therefore, Hasselman would be a valuable employee for any of the many contractor organizations in Washington, DC.

212.  Vu also knew, in advance, exactly how much he could charge for Haselman's services.

213.  No other contractor could stand in such a position.

214.  By manipulating Haselman's contract, and Haselman himself, SAIC knowingly, willfully and recklessly, worked to restrain any competition from other contractors.

215.   SAIC knowingly, willfully and recklessly charged as much as possible to the Black Team without revealing the true nature of the costs involved.

216.   SAIC also prevented Haselman from providing his services to the highest bidder in order to obtain the best price competitively for his professional experience.

217.   SAIC restrained free trade by taking Haselman off the market with the offer of employment before competing companies could evaluate his credentials.

218.   SAIC acted to obtain Haselman's contract fraudulently and for their companies' benefit.

219.   The damages to the United States include, but are not limited to the full value of his contract annually or $375, 000 per year.

220.   SAIC's activity with respect to the Haselman contract also violated several provisions of the FAR.  For example, the FAR prohibits anti-competitive behavior by contractors under Section 3.301 as follows:

> (a) Practices that eliminate competition or restrain trade usually lead to excessive prices and may warrant criminal, civil, or administrative action against the participants.

221.   In addition, the FAR indicates that a contractor should be able to make direct sales to the Government under subpart 3.503-1 as follows:

> 10 U.S.C. 2402 and 41 U.S.C. 253g require that subcontractors not be unreasonably precluded from making direct sales to the Government of any supplies or services made or furnished under a contract. However, this does not preclude contractors from asserting rights that are otherwise authorized by law or regulation.

222.    Haselman was prevented from going directly to the government to try to sell his services and was actually forced to go through SAIC instead of the contractor which had already hired him in order to keep his job.

**E. Defendants Bill Black Team Contract for non Black Team Work, and, Subvert Government Assignment for Billing Purposes.**

223.    The allegations set forth in paragraphs 1-222 are hereby re-alleged and set forth fully as above.

224.    On Morgan's first day of work for SAIC, Bien Vu stated that Morgan would work on both the TSES (Threat System Engineering Support) contract and on the Black Team contract, as needed.

225.    Vu provided Morgan with materials and literature relevant to both topics so Morgan could learn the expected duties.

226.    Vu also said Morgan would be given additional time on an SAIC overhead account to develop new business.

227.    Vu never provided a marketing account for Morgan to charge.

228.    Furthermore, Morgan was only allowed to charge the Black Team account.

229.    Vu prevented Morgan from charging the TSES contract account for TSES contract work.

230.    Instead, Vu directed Morgan to work on a SPARTA project for TSES work and to charge his Black Team account for it.

231.    Vu was anxious to continue to preserve his relationship with SPARTA.

232. The two companies shared overhead expenses, which allowed them to maximize profits on the amounts they billed the government for consulting contracts, and SAIC used SPARTA as the Prime on the Black Team Contract. (*See* Below Sections)

233. In August of 2004, Morgan followed Bien Vu's instruction to bill the Black Team Account for an initial trip to Boulder, Colorado related to work for the TSES Contract.

234. Morgan had been assigned to attend this meeting by Dr. Gordon Niva, a government official of the Missile Defense Agency.

235. Bien Vu approved the allocation of Morgan's time for SAIC to attend the meeting, and told Morgan that this was a Black Team obligation.

236. In September of 2004, Morgan requested authorization to attend the next meeting.

237. However, Denise Del Camp a new government oversight official at the Missile Defense Agency, corrected Morgan's travel request by stating he should charge the TSES account for the trip and not the Black Team account.

238. The government must approve a contractor's travel request, and the first such request for travel by Morgan had been approved.

239. This time it was not.

240. Del Camp's refusal to allow the charge provided Morgan with his first direct knowledge that the TSES and Black Team accounts were not interchangeable.

241. Morgan traveled to the second meting appropriately using the TSES account.

242. Several weeks later another TSES travel obligation occurred.

243. Morgan prepared a travel authorization request, this time properly identifying the TSES account.

244. Morgan submitted paperwork to attend this satellite meeting, on the TSES account, to Vu, the SAIC subcontract program manager who in turn passed it to Beerman the SPARTA prime contract program manager.

245. Both managers told Morgan, that since Beerman was going to be on the west coast anyway, it would be cost-efficient to have him attend both meetings.

246. Beerman did not have to charge the depleted TSES account for his travel.

247.  SPARTA has several contracts with MDA.

248. One of the contracts required Beerman to be in Azusa, California a few days before the meeting Morgan was asked to attend in Los Angeles.

249. Beerman had government approval for travel to attend the Azusa meeting on the appropriate and relevant charge number for that account.

250. The specific number is not known to the Plaintiff at this time, but it is not the TSES contract.

251. On information and belief, the other SPARTA account was charged for Beerman's airline ticket, his rental car, his hotel and meals, and for his billable hours to the government for his work while attending both meetings.

252. This decision by Vu and Beerman, made Morgan suspicious that something was wrong with the TSES contract.

253. The companies both send hundreds of consultants a week on travel and do not stint on expenses.

254. Those expenses, as well as an overhead travel fee, get charged to the government.

255.    If a contract is well funded, the defendants have an incentive to charge the government for travel and related expenses.

256.    Vu also told Morgan there was an accounting problem with the TSES account number and SPARTA could not forward the money to SAIC to cover the time and travel costs.

257.    Sending Beerman to the meeting instead of Morgan was not appropriate on scientific grounds as he was not qualified to handle the technical material to be presented at the meeting.

258.    Beerman had not attended the previous meetings and he had no background in the highly technical nature of the subject, which dealt with satellite engineering.

259.    Morgan had extensive experience with satellite design and development from consulting work with satellite design firms and with the particular satellite, which was the subject of these meetings from previous work in the Pentagon.

260.    Beerman's attendance at the meeting may have made it appear that SPARTA and SAIC were performing their duties, but he could not participate in a meaningful way on the scientific issues.

261.    In addition, on information and belief, Beerman did not charge the TSES account for the billable hours that he did spend at the day of satellite meetings in Los Angeles.

262.    It is strongly suspected that Beerman charged this time to another SPARTA contract, which paid the travel expenses and his time for other meetings he was to attend.

263.  Beerman should have charged the hours and also expenses on a pro-rata basis. Any other charge would be a misallocation of funds.

264.  Beerman was the prime contract manager for SPARTA so all time cards ultimately went through him for final signature before they went on to the government.

265.  He was in a unique position to allocate the funds in this fraudulent manner.

266.  In November 2004, a fourth meeting was scheduled by the government to discuss the topic of this satellite design.

267.  Dr. Gordon Niva, a Missile Defense Agency government employee again requested that Morgan attend.

268.  However, Morgan was not allowed to bill the Black Team, and Vu and Beerman would not permit the charge under the TSES contract.

269.  At this point, Vu admitted what Morgan had suspected, that there was no money in the budget to send Morgan on TSES work, because the account had been depleted.

270.  Morgan was not allowed to attend this meeting.

271.  Vu and Beerman had overspent the TSES account and did not have the funds available to finish the work.

272.  SAIC administrative manager, Tammy Beatty, also confirmed to Morgan the TSES contract was nearly exhausted.

273.  Vu had previously been able to cover TSES account expenses using more plentiful Black Team funds all of which ultimately provided SAIC with profits.

274. The fact that these are separate accounts with separate budgets and separate duties did not deter the SAIC and SPARTA managers from this allocation.

275. Instead, David Beerman of SPARTA put a less qualified engineer in the position of attending the meeting.

276. Beerman apparently had the intention of covering this engineer's time with a different account number than the joint TSES account.

277. Vu and Beerman had acted twice to override the authority of the government employee, Dr. Niva, who was supposed to be supervising the work Morgan performed on the TSES account.

278. In addition to their failure to provide the government with the promised work product from Morgan's efforts, SAIC and SPARTA had subverted the process of MDA work assignments.

279. Morgan was not allowed to contribute as MDA officials requested.

280. A lesser-qualified engineer was advising the government on a technical subject for which he may, or may not, have been qualified.

281. These events also caused personal and professional embarrassment for Morgan.

282. At the conclusion of the first meeting, Dr. Niva had asked Morgan to attend a MDA staff meeting with Ms. DelCamp to explain the technical and managerial implications of the satellite design changes for MDA.

283. Morgan had attended this meeting, and his presentation was well received.

284. Ms. DelCamp and Gordon Niva had asked Morgan to stay involved with the program and to report on a regular basis about the program.

285.    SAIC offered no explanation to the MDA as to why Morgan had suddenly been prevented from participation and left Ms. DelCamp and Dr. Niva to speculate about the reasons they would no longer be receive regular updates about the program.

286.    SAIC and SPARTA knowingly, willfully and recklessly prevented the Agency from functioning as its authorized officer requested, in order to maximize their own profits.

287.    Furthermore, SAIC and SPARTA again violated provisions of the FAR, including but not limited to, sections of the provisions regarding inherently governmental authority. (Sections 2.101 and 7.503 cited above).

## F. SAIC Directed Morgan to Perform More Work for SPARTA's Benefit.

288.    The allegations set forth in paragraphs 1-287 are hereby re-alleged and set forth fully as above.

289.    In late August and early September of 2004, Bien Vu assigned Morgan the task of examining and possibly rewriting a portion of a document called "ACD" (the Adversary's Capability Document) originally created by the SPARTA/TSES group.

290.    The ACD document, as it stood, included information, which had been agreed to by consensus of all the contractors in the Missile Defense community.

291.    It served as a governing document for contractors upon which to base their work, and as a basis for Missile Defense Agency obligations with other contractors and to guide MDA procurement decisions of equipment amounting to billions of dollars.

292.    Morgan objected to this assignment and told David Beerman, the TSES program manager for SPARTA, that such an assignment constituted a breach of "configuration control."

293.    Morgan used the term to mean the authority to develop, amend, delete or otherwise alter such documents with legal force on other contractors.

294.    In Morgan's view, SPARTA could not unilaterally rework a document that many other contractors used as a legally binding basis for the Missile Defense Agency to determine system performance.

295.    The entire assignment appeared to be a "make work" effort to justify spending Black Team budget money on Morgan and David Spetman.

296.    To do this work, Morgan should have been paid out of the TSES account number held by SPARTA.

297.    Properly administered, the two contractors would have to agree to some format for SAIC to loan out Morgan's services.

298.    Moreover, Morgan had been assigned full time to the Black Team as detailed in the Budget document he had submitted to Paul Krause, so there was no legitimate additional time for him to perform TSES work.

299.    Morgan was being forced to do work for the benefit of SPARTA, yet SPARTA was not being billed by SAIC for the work.

300.    Furthermore, the work was not related to Morgan's assignment on the Black Team.

301.    In effect, Vu was volunteering Morgan's services in order to obtain favors from SPARTA in an anti-competitive practice and assure that the two companies would continue to be able to work together.

302.    Over Morgan's objections, Vu made clear that the work was required.

303.    Vu said that if the chapter rewrite was not finished by a specified date, then Morgan would get a poor performance appraisal in an annual review.

304.    Morgan prepared a critique of the previous document and submitted that.

305.    Vu then ordered Morgan to prepare an outline for rewriting the entire chapter.

306.    By October 30, 2004, Morgan had completed approximately 75% of the assignment and submitted an update to both Vu and Beerman.

307.    At that time, several events occurred in the Missile Defense Agency's management that led Morgan to the conclusion that he should change his practice with regard to fulfilling this work.

308.    First, the Missile Defense Agency announced that Denise Del Camp would be elevated to the position of senior contract authority over the Black Team with oversight of the TSES contract.

309.    One of Del Camp's first acts was to establish that the Black Team could not be used for TSES support as indicated by her rejection of a required travel assignment for Morgan. (*See* Section E above.)

310.    Next, in an MDA hosted meeting, a Raytheon representative stated that his company used the same ACD document as the legal basis for adjudication with the government regarding its own contracts with the Missile Defense Agency and for equipment that the US Government would purchase from Raytheon.

311.    The Raytheon official made this observation during a Blue Team/Black Team technical interchange meeting, at which other Missile Defense Agency and contractor personnel were present.

312.    Morgan learned at this meeting that to make any changes to such a document would change existing "performance based" standards for national missile defense equipment that the government had already purchased, or was in the process of purchasing from Raytheon.

313.    If the equipment did not perform as expected and litigation ensued, one of the first legal maneuvers on the part of either the US Government or Raytheon would be to examine the basis of the specifications for the equipment.

314.    Raytheon and the US Government were saying, in effect, that the ACD was the basis for that specification.

315.    Third Morgan had finally learned that Paul Krause was not a government employee but worked for SAIC, which made the Black Team budget document questionable as well.

316.    Morgan billed the Black Team for Black Team work only.

317.    However, Vu continued to pressure Morgan to perform the ACD work, or risk his professional standing. Morgan decided his only choice was to finish the ACD work on his own time, which he did.

318.    SPARTA and SAIC's managers worked together to attempt to force Morgan to perform work for SPARTA.

319.    SPARTA and SAIC knowingly, willfully and recklessly directed Morgan to bill the Black Team for work they required him to perform for SPARTA.

320.    The benefit of such work would have been to continue to bill SAIC's more profitable contract, while producing what looked like work that SPARTA could claim it performed, even though the project itself was of questionable utility from the inception.

321.    The two companies colluded to each other's mutual benefit at the expense of the Missile Defense Agency and any legitimate work Morgan could have been performing for the Black Team.

322.    In addition, this collusion by SPARTA and SAIC was a violation of the FAR including, but not limited to the provision against anti-competitive behavior. (Section 3.301 as cited above.)

**G. SPARTA, with SAIC's Permission, Uses Morgan's Résumé to Help Obtain Contracts, but Directs Morgan not to Participate in the Performance of the Contract.**

323.    The allegations set forth in paragraphs 1-322 are hereby re-alleged and set forth fully as above.

324.    SAIC worked with SPARTA to control contract awards.

325.    In a startling example of this process SAIC allowed SPARTA to use Morgan's résumé to help obtain a contract.

326.    SPARTA's David Beerman directed Morgan to prepare a résumé for SPARTA.

327.    Beerman then included Morgan's résumé with the list of qualified personnel SPARTA intended to provide to the government, as evidence of its ability to perform on the re-competition phase of its TSES contract with the Missile Defense Agency.

328. Morgan asked Beerman if he had used Morgan's résumé in the Capabilities Assessment submitted to the Government, and Beerman confirmed that he had.

329. The Capabilities Assessment is the pre-release phase of the solicitation in which the government qualifies bidders based on the depth of their staffs.

330. By this time Morgan had been directed by SPARTA and SAIC to bill 100% of his time against the Black Team contract.

331. He would, therefore, be unavailable to work on the TSES contract according to the direction of Bien Vu and Beerman.

332. Indeed, at this point, Vu and Beerman had denied Morgan the ability to bill against the TSES contract twice, both in the case of traveling to the satellite meeting, and in rewriting the chapter in the ACD. *See* Above

333. SPARTA and SAIC knowingly, willfully and recklessly attempted to obtain additional government work by using Morgan's résumé as if he would be a SPARTA employee, or he would have additional time available as an SAIC subcontract employee.

334. The two companies worked together to use one of the most senior résumé's available to help freeze out any other possible competition.

335. The full value of this contract obtained through fraud in the inducement, is approximately $5 Million per year.

## H. Bien Vu of SAIC and David Beerman of SPARTA Misrepresent Expenses

336. The allegations set forth in paragraphs 1-335 are hereby re-alleged and set forth fully as above.

337. Vu told Morgan that to represent to former government clients of Morgan's that the SAIC contract with SPARTA allowed them to offer Morgan's services at a reduced burdening rate of 80%.

338. Vu instructed Morgan to make such representations in any attempt to obtain business for SAIC from Morgan's previous clients.

339. "Burdening rate," is an industry term that describes additional charges to the government that are non-salary and benefit costs related to human resources.

340. It refers to the amount of cost above salary that the government must pay to a contractor in order to obtain the services of a contractor employee.

341. In fact, SAIC charged higher burdening rates to the Missile Defense Agency.

342. SAIC's agreements with SPARTA did substantially reduce costs, but these cost reductions were not reflected in the burdening rate SAIC charged to the MDA.

343. SAIC's agreement with SPARTA covered the cost of security, information technology support and office space.

344. SAIC had no onsite support for site security or for information technology.

345. SPARTA employee Chris Gonzales supplied all support for information technology including firewall protections on the SAIC local area network.

346. SPARTA employee Mike Marden performed site physical security.

347. SPARTA employee Emily Beidelman performed classified document control and classified facility management.

348. SPARTA, SAIC and Mil-TEC personnel shared office space at 1911 N. Fort Meyer Drive, Arlington, Virginia.

349.  Mil-Tec was a third contractor that was performing work under the SPARTA/TSES prime contract.

350.  Cost-sharing went beyond merely agreeing to sublet space from SPARTA.

351.  For example, Mil-Tec employee Robert Krancs and Mark Pesses of SAIC shared the same office space.

352.  SAIC charged burdening rates to the Missile Defense Agency that included charges based on the square footage of the office space it made available to its employees.

353.  The shared office space did not have a square footage that equaled the amount that SAIC charged the government.

354.  SAIC also charged the government for office space based on the most expensive rent of the offices in use at Tyson's Corner Virginia, rather than the more modest sublet it paid for the price of the offices in Rosslyn, VA.

355.  However, SAIC used SPARTA employees to support the overhead for the Black Team under a fixed price arrangement at lower rates than SAIC reported to the government.

356.  The Black Team support personnel were already being paid under the TSES/SPARTA account, saving SAIC overhead expenses that they were billing the government.

357.  Morgan also determined that Paul Krause maintained an office at government expense on federal property at the MDA offices adjacent to the Pentagon.

358.  When the government pays for a substantial portion of the office costs of a contractor employee working on federal property, the company must bill the

government at a different, lower, rate than it would for an employee who spends a substantial amount of time at his own, contractor facility.

359. When the contractor employee uses electricity, phone services, copying machines, secretarial services and office space that are, in fact, owned and supplied by the federal government, the components of the burdening rates related to these expenses must not be charged to the government.

360. Therefore, the actual costs to SAIC to conduct Black Team business were less than contemplated under the rate charged to the government.

361. SAIC is required to tell the government about such rental and office space arrangements under the FAR.

362. During Morgan's review of the Black Team Budget, he determined that SAIC charged more than 100% for a burdening rate on his own salary, compared to the 80% Vu claimed it was charging.

363. Nonetheless, Vu directed Morgan to make the lower cost representation to Morgan's previous Defense Agency and Central Intelligence Agency clients in order to attempt to obtain more business for SAIC from these organizations.

364. In late August of 2004, a senior member of the Defense Intelligence Agency asked Morgan to manage a program for him.

365. Morgan, as an employee of SAIC, informed the Defense Intelligence Agency that he could only work on an arrangement through SAIC, because of his new employment status with the company.

366. The Defense Intelligence Agency's government representative agreed to discuss the matter with Bien Vu.

367. After consultation, Vu agreed to allow Morgan to work for 20% of his time on the Defense Intelligence Agency business through an existing "time and labor" cost contract that SAIC had with the Defense Intelligence Agency as a sub contractor to another contractor called BAE Systems.

368. As he had been instructed to do by Vu, Morgan told the Defense Intelligence Agency that his burdening rate would only be 80%.

369. Instead, on information and belief, SAIC charged the US Government a much higher burdening rate.

370. To complete these duties for the Defense Intelligence Agency, Morgan used no SAIC equipment, personnel or other resources that justified any overhead expenditure on the part of SAIC.

371. Morgan worked in an off-site location, and used his own computer, scanners and other office equipment to prepare documents.

372. SPARTA and SAIC worked together, knowingly, willfully and recklessly to conceal the true cost of their business expenses from the government in order to create higher profits for the companies.

373. Damages to the United States include, but are not limited to, the burdening rate of Mr. Krause's salary, as well as the difference between what SAIC claimed for its burdening rate and the reduced amount it had to pay for burden sharing with SPARTA.

374. The cost would be approximately the salary of each employee on the Black Team and TSES contracts or roughly $3 million per year over the multiple years of the contract execution.

375. Damages also include the additional burdening rate charged to the Defense Intelligence Agency for Morgan's work on that contract.

376. Furthermore, the fact that Vu attempted to have Morgan market services based on a misrepresentation of Morgan's burdening rate provided the plaintiff with additional evidence that SAIC routinely misrepresents such burdening rates in attempts to obtain contracts throughout the defense industry.

**I.  SAIC Charges for Employee to Review Undergraduate Level Text Books**

377. The allegations set forth in paragraphs 1-376 are hereby re-alleged and set forth fully as above.

378. Initially, Bien Vu asked Thomas Morgan to interview Dr. Mark Pesses as a possible addition to the Black Team.

379. Vu asked Morgan to determine if Pesses was suitable to evaluate sensor data on work associated with space object detection.

380. The Black Team needed someone with analytical skills related to infrared sensor systems.

381. Mark Pesses was qualified for this work and Morgan recommended that Vu hire him for duties within the Black Team.

382. Once on the payroll, Pesses prepared briefings within the scope of his education and experience related to sensor systems.

383. Bien Vu rejected those briefings.

384. Vu said they lacked relevance to the Missile Defense Agency.

385. He told Pesses "You have not proved this is important to me yet."

386. As a result Dr. Pesses became depressed and needed clinical treatment for depression.

387. Bien Vu unilaterally changed Pesses' assignment, ignoring the duties Vu told him he would be performing at the time of hire.

388. Vu ordered Pesses to read elementary radar textbooks suitable for undergraduates.

389. Peses time and overhead was, of course, billed to the Missile Defense Agency's Black Team by SAIC through its subcontract with SPARTA.

390. The MDA received no benefits from having Pesses read undergraduate texts, in fact the MDA already had access to radar expertise of world-class caliber.

391. Vu ordered Pesses to bill for developing the manpower associated with creating an "in house" Radar expert to have on staff.

392. Vu wanted to be able to claim that Pesses brought new abilities in this area to SAIC in order to use such qualifications to compete for future contracts, related to Radar analyses.

393. This particular expertise was already abundantly available within the technical ability of the Black Team.

394. The Black Team's budget included a line item for the Massachusetts Institute of Technology/Lincoln Labs specifically dedicated for Radar performance analyses.

395. The Massachusetts Institute of Technology/Lincoln Labs is one of the foremost institutes on the subject and was budgeted by MDA to be available specifically for that purpose of radar analyses.

396. Furthermore, Dr. Maile Fries, an extremely senior scientist, who was specifically authorized to work for both the Black and the White Teams, had arranged for two nationally recognized radar experts Joe Ralston and Mike Tooley to be put on retainer through the Institute of Defense Analysis.

397.    They were available to do work at her discretion, on Missile Defense issues related to Radar analyses.

398.    As Dr. Fries was also appointed to the White Team, her ability to acquire Radar information for the Missile Defense Agency through this arrangement would have been legitimate and unquestioned.

399.    Vu was well aware that Pesses' limited Radar knowledge was not needed for the Black Team.

400.    Pesses felt he had been hired under false pretenses and complained to Morgan.

401.    However, Pesses, under orders from Vu, continued to bill the Black Team accounts full time, for work that was not needed.

402.    Pesses felt that he had been misled about his duties and the way that Vu used the time of all the senior staff that supported the MDA.

403.    Pesses mentioned his concerns to Tom Harris, a senior official in the SAIC Advanced Concepts Business Unit.

404.    Harris advised Pesses not to make an issue of it, or he would be labeled a "whistleblower."

405.    SAIC therefore, knowingly, willfully and recklessly used Mark Pesses' contract to its own ends.

406.    The purpose was to attempt to create an employee who would put the company in a position to compete for future contracts, at the expense of the current contract, with no current benefit to the Missile Defense Agency.

407.    This is an egregious, but not isolated, example of an SAIC employee who was directly billing the Black Team for work that had no value to the Black Team.

408.    Dr. Pesses was instructed to work on a project totally outside his area of expertise and outside the area for which he was hired.

409.    Each and every weekly time card signed by Dr. Pesses as he followed the orders of his managers constitutes a separate violation of the False Claims Act.

410.    As of the filing of this complaint, Dr. Pesses is still employed by SAIC at the Missile Defense Agency.

**J. SAIC and SPARTA Did Not Provide a Proper Work Environment.**

411.    The allegations set forth in paragraphs 1-410 are hereby re-alleged and set forth fully as above.

412.    Morgan had reason to be concerned with the quality of SAIC's work even before joining the company.

413.    As early as December of 2003, Morgan was interviewing for a position with SAIC and met a young woman on Vu's staff named "Erica " in order to discuss SAIC's contract with the MDA.

414.    Erica and Morgan had a private conversation out of Vu's hearing.

415.    She listed many deficiencies with the work she was conducting and said she was looking for a new job.

416.    This employee also pointed out that SAIC refused to purchase "finite element" software and to upgrade a temporary license it had for trajectory analysis software.

417.    Finite Element software is the basis for modern computer aided design projects and is a standard tool used in structural research.

418.    Two other young engineers that SAIC assigned to speak with Morgan stated similar concerns.

419.    However, in order to work on missile technology, Morgan felt he had to join SAIC, anyway.

420.    By the time Morgan began his work, four months later, all three of these engineers had left the company.

421.    While working for SAIC, Morgan constantly heard complaints about the quality of the work that even junior level employees were assigned.

422.    David Spetman said his work was superficial.

423.    Keith Holland complained of lack of career development and opportunity.

424.    Morgan learned that the previous Black Team Manager, Dr. Joshua Kolawole, left SAIC when he found out Lee Phillips would be his new boss.

425.    One of Morgan's duties was to replace Kolawole's position on the Black Team.

426.    Within eight months at least six employees, out of a group composed of ten to eleven, left SAIC or SPARTA

427.    Morgan was convinced that such a high turnover and the many complaints were both the result of, and contributed to, a dysfunctional work environment.

428.    SAIC and SPARTA's management priorities were to ignore such problems with personnel (the human resource companies' only major asset) in order to maintain a lucrative billing arrangement with the Missile Defense Agency.

429.    Morgan did approach Bien Vu about insufficient software tools to perform credible work, and in particular, the Finite Element software.

430.    Vu stated that it was the government's responsibility to purchase such tools.

431.    This is not an expensive item.

432.    Finite Element software can be purchased for as low as twenty thousand dollars with licenses.

433.    Such software is also critical to the consulting work that SAIC was supposed to provide and traditionally the contractor must purchase this software as a cost of doing business.

434.    SAIC and SPARTA knowingly, willfully and recklessly continued to bill the Missile Defense Agency even as they maintained a work environment which was not capable of providing the high level technical expertise contemplated by the contracts.

435.    SAIC abused its workforce which in turn led to low moral and high turnover rates at SAIC's MDA contractor facility.

436.    The US Government specifically identifies high turnover and low worker morale as threats to its ability to conduct important government programs.

437.    That concern is spelled out in Section 52.222-46 of the FAR as follows:

52.222-46 Evaluation of Compensation for Professional Employees.

(a)Recompetition of service contracts may in some cases result in lowering the compensation (salaries and fringe benefits) paid or furnished professional employees. This lowering can be detrimental in obtaining the quality of professional services needed for adequate contract performance. It is therefore in the Government's best interest that professional employees, as defined in 29 CFR 541, be properly and fairly compensated. As part of their proposals, offerors will submit a total compensation plan setting forth salaries and fringe benefits proposed for the professional employees who will work under the contract. The Government will evaluate the plan to assure that it reflects a sound management approach and understanding of the contract requirements. This evaluation will include an assessment of the offeror's ability to provide uninterrupted high-quality work. The professional compensation proposed will be considered in terms of its impact upon recruiting and retention, its realism,

and its consistency with a total plan for compensation. Supporting information will include data, such as recognized national and regional compensation surveys and studies of professional, public and private organizations, used in establishing the total compensation structure.

...

(c) The Government is concerned with the quality and stability of the work force to be employed on this contract. Professional compensation that is unrealistically low or not in reasonable relationship to the various job categories, since it may impair the Contractor's ability to attract and retain competent professional service employees, may be viewed as evidence of failure to comprehend the complexity of the contract requirements.

(d) Failure to comply with these provisions may constitute sufficient cause to justify rejection of a proposal.

438.    The poor work environment led to an extremely high turnover rate in this group.

439.    Such a turnover rate creates damages to the United States through the learning curve for new employees, which impacts their ability to be productive initially, the administrative work required to hire new employees and integrate them into the MDA structure.

440.    The damages to the United States include but are not limited to costs charged to the Government for retraining new hires lost to this turnover rate, which approach $2 million per year.

## K. SAIC Produces Substandard Work Under Two Contracts

441.    The allegations set forth in paragraphs 1-440 are hereby re-alleged and set forth fully as above.

442.    Morgan's concerns about SAIC's work product were only confirmed and multiplied by his experience once he began to work for the company.

443.  SAIC and Bien Vu's priority to create work, which SAIC could then bill time against, meant that Vu constantly assigned work with reckess disregard for the technical nature of the assignment.

444.  SAIC wasted staff time on projects, which were incorrectly assigned and could yield no technical benefit to the Missile Defense Agency.

445.  Vu's action in this regard reflected SAIC policy, rather than conflicting with it, as Vu was following orders to maximize SAIC's profit on contracts and suffered no consequences from his management of these contracts.

446.  Even when confronted with the poor technical nature of the work SAIC presented, Vu often pressed ahead, wasting time and government resources.

447.  The Plaintiff cites four specific examples faulty scientific projects by SAIC and SPARTA which were the result of the defendants' willfull, reckless and knowing failure to perform their contracts.

448.  Furthermore, the contractors knowingly presented at least one of these faulty projects as finished scientific work.

449.  The defendants acted with reckless disregard as to the quality of the work produced in each instance and continued to bill for time to pursue all four examples at greater expense to the government.

450.  The science created in these instances is relied upon by the MDA for tests and procurement which are extremely costly, creating potential damages in the hundreds of millions of dollars as well as possibly compromising national defense.

451.    SAIC reckless disregard as to the scientific issues involved and unwillingness to present them properly was a source of constant frustration to the Plaintiff.

452.    The Plaintiff saw valuable staff time of government employee and government contractor engineers and scientists wasted by SAIC.

453.    Even when such scientific failure was explained to SAIC management it was not changed or fixed, but rather presented to the government.

454.    The Plaintiff cites the following four examples of scientific failure as creating damages to the United States in themselves as well as presenting evidence of other damages created by the defendants' poor scientific practice generally:

**1. First Example of scientific failure:**

455.    During the summer of 2004, Relator, Thomas Morgan was evaluating the engineering feasibility behind a $250 Million MDA program called the ADI.

456.    Mr. Morgan received the assignment from Dr. Maile Fries.

457.    Dr. Fries is among the most senior scientists in the country working on MDA issues and she holds appointments to both the Black and the White Teams.

458.    The ADI concept called for detonating an explosive from one booster in outer space in front of objects that would be released from a second booster.

459.    The Blue Team reviewed funding for ADI and MDA placed money to perform a test of the ADI concept through a contract with Boeing.

460.    Boeing had overall responsibility to prepare and produce a booster for a space test of the concept, and that company subcontracted with Northrop Grumman to produce the actual explosive device, which would be fit on top of the Boeing rocket.

461.    During his evaluation, Morgan discovered, and reported to Dr. Fries, that the development of the explosive cloud would take on a different shape than the spherical shell shape that Northrop Grumman used as an initial assumption.

462.    The explosive had a slow burning time and so the cloud of explosive debris would not be released instantaneously, but instead would create a volume that would be better approximated by a filled sphere of material rather than a spherical shell.

463.    Furthermore, the shape of the cloud would be far different than the spherical assumption that Northrop Grumman used, because in real life the cloud assumes a shape due to the combined effects of the explosion superimposed on the ballistic velocity on a ballistic trajectory.

464.    Morgan reported to Dr. Fries that because the cloud would not be spherical and would have a different momentum response than predicted, the time of the passing of the objects released from the second rocket and the particles from the explosion emanating from the first rocked would be more critical than originally specified.

465.    Morgan recommended to Dr. Fries that each of the variables that might influence the true position of the material be evaluated.

466.    For instance, because the two trajectories might have a relative velocity of 8 kilometers a second, a difference in the timing circuit that fired the detonator of only 250 milliseconds (1/4 second) would mean the two trajectories would miss each other in space by 2 kilometers and the test would be a failure.

467. From Morgan's work with explosives he knew that a 1/4 second error in detonation was often encountered in practice due to cold temperatures of the initiators or unexpected resistance in the firing circuit.

468. Morgan's work on the subject satisfied Dr. Fries and she encouraged Morgan to continue work on the project.

469. She asked Morgan to provide a statistical evaluation and summary of all of the factors that would contribute to a miss in the space test of the concept.

470. In order to provide this statistical evaluation, Morgan needed to produce exact trajectory positions as a function of time for the ballistic objects to determine the projected miss distance.

471. Morgan asked David Spetman of the Black Team for assistance in running some computer aided trajectory analyses.

472. The SAIC manager Bien Vu had told Morgan to "work with the young guys" to bring them up to speed and this appeared to be the ideal opportunity to develop an understanding in Spetman for Orbital Mechanics.

473. However, Bien Vu intervened and told SAIC consultant Kerry Patterson to provide the orbital mechanics solution.

474. Patterson researched the topic on the web and came up with a computer program, which had no relevance to the problem.

475. Based on Morgan's professional experience, including work completed for his Master's degree, and several years of professional work done at the request of Edward Teller, the founder of the original MDA predecessor concept known as SDI, Morgan possessed substantial expertise in this area.

476.    Nonetheless, Vu assigned the problem to Patterson.

477.    A few days later, Patterson reported that he had solved a closed form orbital flight path problem that was an explicit function of time using a mathematical algorithm he found on the internet.

478.    Mathematicians have sought for over four hundred years to obtain just such a solution to this equation as an explicit function of time with no success.

479.    Morgan was well aware that such a solution was extremely unlikely to be found explicitly on the Internet, as Patterson was claiming.

480.    Morgan, therefore, thought Patterson was using a numerical integrator, the next best approach, but not an exact answer to the problem.

481.    Morgan asked which numerical integrator Patterson was using.

482.    Patterson said he did not need a numerical integrator, because his web site equations provided explicit solutions to the orbital problem as a "function of time".

483.    This is a mathematical impossibility.

484.    All closed form solutions to the orbital equations under discussion are functions of "orbital angle" instead, though some approximations are available.

485.    Because the problem under discussion could not use an approximation due to the loss of accuracy in the application, which would not be acceptable considering the critical timing issues involved, Morgan investigated the matter further.

486.    Morgan provided Patterson with a textbook on Orbital Mechanics **An Introduction to the Mathematics and Methods of Astrodynamics, Revised Edition** Richard H. Battin - Massachusetts Institute of Technology (Author),

*AIAA Education Series* Published by AIAA, © 1999, 799 pages, Hardback, ISBN: 1563473429.

487.    This book was the official publication of the American Institute of Aeronautics and Astronautics, the relevant Professional Engineering Society that substantiated the fact that Patterson's solution was not possible and showed many of the various approximations that have been used over the centuries.

488.    Patterson's reaction was to challenge the book.

489.    However, Morgan's close inspection of Patterson's work showed it to be completely incorrect.

490.    Patterson was using the correct formulation of the equations, but he was solving the problem for angular motion and not time.

491.    In addition, he had set the problem up in such a way that the endpoints of the trajectory he was trying to analyze represented an object that was incorrectly oriented with respect to the earth as defined by its ballistic trajectory.

492.    Vu expected to use Patterson's solutions for two purposes.

493.    Firstly Vu expected to use these solutions to determine object spacing of warheads and "associated objects" released from a threat nation's booster along the trajectory corridor it follows at different points in time, as well as the angular dispersion with which a sensor system would see these associated objects.

494.    The MDA needs such guidance to purchase sensor systems with the correct field of view to see as many objects as possible.

495.   Secondly Vu expected to use Patterson's solutions as a way to investigate the evolution of the explosive debris cloud problem that Morgan was working on for ADI.

496.   An incorrect analysis in the first instance had the potential of costing billions of dollars because sensor systems field- of- view estimates set the performance parameters for MDA to purchase hardware for interceptors.

497.   These sensors ride on the interceptors that impact incoming ballistic missiles. Patterson's formulation of the problem would have the sensor systems looking at wild and random points in space.

498.   Incorrect analyses in the second instance similarly had the potential to cost taxpayers hundreds of millions of dollars.

499.   The ADI test, which Morgan was evaluating for Fries, had been budgeted for $250M.

500.   A failure of the test would occur if a timing error as small as 1/10 of a second took place.

501.   Missing the proper timing for the event would mean a complete loss of that entire budget dedicated to this project.

502.   In the past, MDA has failed in several experimental tests, because of exactly these types of errors introduced into the system evaluation effort.

503.   Patterson was grossly incorrect in his approach to this problem, but SAIC did nothing to correct it.

504.   Vu's assignment of Patterson to work the issue as well as ignoring Morgan's criticism recklessly endangered the project.

505.  Morgan was still working on the ADI topic at the direct request of Dr. Fries at the time SAIC fired him.

## 2. Second Example of Scientific Failure

506.  The MDA held an early September 2004 joint meeting for the White and Black teams.

507.  At the meeting, Dr. Ashton Carter, former Assistant Secretary of Defense and a White Team member, asked a question about object motion in space after an object has been released from a ballistic missile.

508.  After the meeting Dr. Maile Fries, a joint member of the White and Black Team, followed up by asking Vu a question regarding "micro-dynamics" of spinning bodies related to Dr. Carter's issue.

509.  Vu discussed the question with Morgan and asked for a way to frame the problem. Vu wanted an analysis to brief Dr. Fries.

510.  In the conversation with Morgan, Vu misused several terms related to gyro-dynamics, but persisted and asked a junior staff engineer, Chris Neilson, to numerically integrate the equations that describe spinning motion using different, but randomly, selected initial conditions.

511.  Morgan pointed out that randomizing initial conditions posed a wasteful exercise, because the literature on the subject contained many "closed form solutions" that could guide the numerical integration, and in some cases provide an exact solution to the problem Vu was considering.

512.  Morgan had worked on his Doctoral Dissertation on this specific topic and was intimately familiar with the literature on the subject, as required by his oral qualifying exams.

513.  Instead of randomizing the problem as Vu had framed it, Vu had a chance to train the young engineer in the mathematical rigors of the topic in a way that would allow him to fully understand the complexity of the problem.

514.  Under the SPARTA TSES contract, unlike the Black Team contract, such training and time spent for a junior engineer to become familiar with the subject matter would have been appropriate and expected as a duty of the contract.

515.  Furthermore, Morgan told Vu that the standard textbook *Classical Mechanics* by H. Goldstein, Addison Wesley, Reading, Massachusetts, 1980. contained a solution to a nearly identical problem.

516.  Morgan even sketched a diagram from this book on his whiteboard to show Vu the application.

517.  Vu ignored this discussion completely and assigned the project to the young engineer in Vu's original form anyway.

518.  The young engineer ran computer simulations many times with random variations and tried to infer the motion's endpoints from the data.

519.  Vu then briefed this solution to Denise DelCamp of the Missile Defense Agency, as evidence that SAIC was contributing to the study of micro-dynamics and used the work product to justify further TSES and Black Team funding for the subject.

520.  Vu later briefed the same information to the Black Team Technical Evaluation Board on November 8th, 2004 at the Institute for Defense Analyses.

521.    At this meeting, Dr. Mike Hankamer, a member of the Evaluation Board, presented material of his own on inertial properties required by Vu's analysis as input conditions.

522.    These inertial properties varied quite substantially from the values Vu used in his computer solution, indicating that Vu had also missed the importance of a variation in the entire suite of initial conditions required to properly solve the problem.

523.    In this case, Vu established the wrong initial conditions for the problem he asked junior engineers to perform, and had them repeat meaningless changes in these initial conditions.

524.    Several variables must be established in order to conduct a computer analysis as Vu assigned it.

525.    Vu specifically missed the importance of setting two angular rate dynamic variables correctly.

526.    In addition, the material that Mike Hankamer presented at the Black "Core" Team meeting on November 8th, 2004, showed that Vu had a poor understanding of the actual inertial properties he should be using, particularly the "moments of inertia" of the body and the ratio of these moments of inertia.

527.    Mike Hankamer's presentation is believed to be still available at the Institute for Defense Analyses where it was presented for review and the variations in inertial properties can be shown from this to be quite different from Vu's choices.

528.  Vu himself realized his mistake later and worked to have this analysis redone as indicated by the request he made of Dr. Mark Pesses, a more senior scientist on the Black Team staff.

529.  In the request, Vu specifically asked Pesses to consider the problem from a theoretical rather than a computational standpoint.

530.  The potential loss to the US Government for repeating analyses performed by SAIC is approximately two man years of labor and roughly a man year of labor producing the incorrect material in the first place.

531.  In addition, SAIC briefed the material it prepared to the White Team, to senior government contract administrators, and to members of the Black Team.

532.  The US Government pays members of the White Team on a consulting basis.

533.  The White Team includes: two Nobel Laureates, 1 retired four-star general, one ex-CEO of Lockheed Martin, one ex- Assistant Secretary of Defense, among others.

534.  Each of these consultants has billing rates of between $2000 - $3000 per day.

535.  Presumably, each of these briefings needs to be repeated when the material is complete.

536.  Briefing and review will consume an additional two man-years of labor and meeting time.

**3. Third example of scientific failure.**

537.  Vu knowingly released trajectory analysis data that contained potential errors, and which would be used as the basis of other analyses then being provided to other MDA contractors in support of hardware acquisition decisions.

538.  During the early summer of 2004, Vu agreed to provide threat "data package" analyses to the broader MDA community without saying whether he was performing this work under the Black Team, or the TSES contract.

539.  Vu asked Morgan to provide one scenario threat package and review the work of others.

540.  On June 18, 2004, Bien Vu hosted a meeting on behalf of the MDA to review the "threat" packages that MDA design engineers use to size and qualify their technical hardware.

541.  MDA has such meetings to define the requirements for its equipment.

542.  In this case, the MDA needed to understand the performance of foreign threat missiles and the objects these missiles release at the time of burnout.

543.  MDA uses the information to build sensor systems that discriminate between real warheads that carry weapons of mass destruction, and objects that appear to US sensors as ballistic warheads even though they aren't true warheads.

544.  In addition to these "associated objects," foreign missile powers may also release radio frequency transmitters and flares to confuse or jam radar signals and infrared sensors.

545.  If the US cannot discriminate between these decoys, or if the US cannot detect the actual objects because its sensors are blinded, confused or unusable, then the US will launch interceptors against false objects and simple decoys that are harmless and waste interceptors that could be used instead against a real warheads.

546.  Many different kinds of technology are used to detect objects in space including infrared sensors, radars, and visible spectrum cameras.

547.  The amount of infrared energy that decoys emit, the radar reflectivity of decoy objects and the rough size and mass distribution of released objects are all indicators that may be used to determine if an object in space carries a threatening warhead, or instead is meant merely to confuse US interceptors and draw fire.

548.  During the June 18th meeting, Vu stated that SAIC would review the "threat data packages" to determine which notional foreign designs offered realistic threats to the US and which foreign powers might be capable of constructing these "packages".

549.  The MDA contractors that actually build the hardware that goes on US interceptors and ground based equipment, would then use these threat data packages to set the sensitivity for their designs of hardware and size the resulting equipment.

550.  Producing a design that closely matches the foreign capability is critical to this process.

551.  Radars launched into space on the front of US interceptors, for instance, must emit a radar wave, which in turn requires a battery power source.

552.  The return radar signal that makes the object evident depends on the distance between the emitter and the reflectivity properties of the object being detected, among other things.

553.  If the threat missile, in addition, releases a radar jammer then the emitted radar signal from the interceptor must burn through this jamming signal in order to provide the required discrimination.

554.    "Burning through" requires additional battery power, which is dependent on the strength of the jamming.

555.    Because the battery power is limited on an interceptor, the US needs to build a radar system that just meets the need to see the object.

556.    If too much power is required then the payload carried on the interceptor becomes too heavy and the booster putting the interceptor in space becomes unwieldy and inefficient.

557.    If the power is too little the radar will not emit enough power to see the object and the interceptor launch will be wasted.

558.    The purpose of the threat data packages, then, is to design the best representation of the foreign hardware so that US designers can exactly match the performance required with a conservative design.

559.    Vu assigned Morgan a specific threat data package, and Morgan began by asking David Spetman and Chris Gordon to provide him with eight typical trajectories that a foreign missile power might use to attack the US.

560.    Morgan had two objectives in mind firstly to determine the exact distance from ground-based radar stations to the threat missile, so that he might have some understanding of the consequences of radar jammers on the missile, and secondly to determine the burnout altitude so that he could estimate how long the threat objects might be exposed to drag in the residual portions of the atmosphere after release and exposure to the sun.

561.    Both of these effects cause objects to heat up and emit infrared energy, which can be detected by infrared sensors.

562.    This, in turn, directly impacts how much energy threat objects and weapons of mass destruction warheads would absorb, and in this manner, provides equipment designers the temperature of the objects, a measure of their detectability by infa red sensors.

563.    As Morgan began to review the trajectory burnout points that Spetman and Gordon provided him, it appeared that the results provided by SAIC did not correspond to realistic trajectories.

564.    The questionable results appeared in the burnout positions.

565.    Though the eight trajectories under analysis represented radically different targets in the US, and therefore different flight paths, all of the burnout altitudes and downrange positions appeared to be almost at the same point.

566.    Morgan compared the results to various estimation techniques that he had learned over his professional career and in college course work as a graduate student.

567.    The SAIC produced trajectories differed considerably from these estimated values.

568.    The consequence of a poorly predicted burnout point was that the distance from the interceptor to the warhead would not be correctly estimated.

569.    A distance mis-match would mean that such things as radar transmitters on the interceptors, or on the ground would be undersized.

570.    Morgan told Vu about the discrepancies, and provided Spetman with a copy of his course notes from ME 550, *Ballistic Missile Design*, a graduate level course at Purdue for aeronautical engineers.

571.    The notes had graphical solutions for determining missile flight paths, and Spetman worked out the solutions from these notes and noted the discrepancies for himself.

572.    Morgan asked Vu to let him sort out the source of the discrepancy before SAIC released any data, which would be used to improperly design hardware.

573.    Vu dismissed Morgan's concerns and said that it was more important to meet the deadline for producing the threat data packages rather than doing the work correctly.

574.    So Vu refused to allow Morgan to investigate discrepancies, which directly influenced the design of US hardware.

575.    Vu later confided to Morgan that "everyone knew there were mistakes" in the simulations provided by the particular computer routine SPARTA used, named STAMP, but he could not fix those problems, and the only thing he could do was meet the deadline for producing the results.

576.    He then told Morgan that the fact that the burnout points were wrong didn't matter.

577.    As a consequence, Vu knowingly released eight threat data packages to US designers in July of 2004, which contained erroneous information that directly affected US designs of MDA equipment.

578.    By ignoring the trajectory errors, Vu had actual knowledge that he was releasing information that designers would rely on to design and build specifications for the total radar signal that US systems needed to create to detect foreign missile

warheads, and the sensitivity of infrared sensors that had no correlation with actual equipment that might be needed.

579.  Morgan later discovered that as early as March of 2004, MDA had announced it was no longer going to support the STAMP computer program that Vu's TSES staff used to generate these trajectories.

580.  In other words, Vu was knowingly releasing false information that would be used in the design of MDA hardware and using obsolete computer codes to do it.

581.  Later in a Blue/Black team meeting, a presenter for Raytheon was questioned about the trajectories that his company used to design and emplace sensor systems.

582.  He responded by citing the documents Vu produced as the legal basis for Raytheon's procurement contracts with the US Government.

583.  Vu's analyses were released by SAIC and certified as correct and thus had become the legal basis for MDA's hardware acquisition.

584.  The release of this information created the danger that more procurement decisions made by the Missile Defense Agency, and other Defense Agencies based on these results might similarly be in error.

585.  The potential damages to the United States Government resulting from SAIC's analysis, as detailed in the above example, would be the cost of the labor and acquisition for approximately $350 Million in equipment that would be placed on MDA kinetic kill interceptors, or at foreign ground-based sites overseas.

586.   As a minimum, the analysis provided by SAIC needs to be redone and any acquisition and labor that MDA completed based on this analysis needs to be reevaluated.

587.   The reevaluation alone would cost to the US Government of approximately 20 person-years in labor.

### 4. Fourth example of scientific failure

588.    At a White Team meeting in July of 2004, SAIC Area Manager, Bien Vu, presented his analysis of a phenomenon called the "Doppler Notch."

589.   The Doppler Notch is a position and orientation phenomena where Radar stations may be blinded from detecting the motion of objects.

590.   Most modern radar stations can detect both the distance to an object and the object's velocity along a line between the radar station and the object.

591.   To detect the velocity, the radar station compares the signal frequency sent out to the object with the signal that returns from the object to the radar station.

592.   There is a small frequency shift in the two signals that depends on the object's radial velocity and the initial frequency of the signal.

593.   This is called the Doppler shift, which can be measured by the radar's signal processors.

594.   In certain geometric orientations, the velocity of the object may have no radial velocity with respect to the radar (in other words, it is not moving directly towards or away from the signal transmitter).

595.  In reality, the object may have a large velocity, but at the specific condition of Doppler notching all of that velocity is moving exactly perpendicular to the radar signal, so the radar signal does not measure any Doppler shift.

596.  Any radar station oriented in this respect to a moving object is essentially blind to the movement, or velocity, of the object.

597.  The location of all such regions on the ground is called the "Doppler Notch."

598.  During the presentation at the White Team meeting, Vu made the argument that his analysis showed all locations where the Missile Defense Agency could not site a radar station because, at these locations, the station would not detect motions of the ballistic missile that needed to be measured.

599.  To obtain his Doppler Notch predictions Vu ran a series of computer simulations using a computer program called "Satellite Tool Kit" to calculate the orientation of the velocity vector of the missile with a point on the ground that could host a new radar station.

600.  However, to complete the analysis he had arbitrarily selected a variety of orientations for the missile's velocity with respect to the horizon.

601.  Vu apparently did not understand that a missile has to follow a specific trajectory to reach its target, and that the arbitrary orientations he had chosen could not exist physically in nature for real targeting conditions.

602.  Every ballistic missile trajectory has, at most, two orientations that the velocity vector may assume with the local horizon (called "depressed" and "lofted" trajectories) and in most cases there is only one (called the "minimum energy" trajectory) for the missile to leave one point and impact another.  For reasons of

missile accuracy, and to reach the greatest range, ICBM's traditionally fly on the "minimum energy" trajectory, though in some cases, if the trajectory is shorter than the maximum range of the rocket, either the lofted or depressed trajectory may be selected.

603.    In either case, the angle is not arbitrary and cannot be chosen at will as Vu had done in his analysis.

604.    Every student of ballistic missiles should understand the concept of the constrained relationship between the velocity vector, the local horizon and the impact point of the missile.

605.    It is widely covered in virtually every college textbook on the topic.  In fact, every ICBM silo maintained by the US Air Force contains a diagram called the "V-gamma" map for the missile in that silo.

606.    In this case, "V" stands for velocity and "gamma" stands for the angle that the missile velocity has with respect to the local horizon at the time the fuel burns out.

607.    Instead of referencing this fact, Vu's analysis indicated that he had picked many arbitrary angles between the velocity vector and the local horizon.

608.    In one case, he even showed a Doppler Notch that would have required the missile to be flying parallel to the ground.

609.    This could be inferred from the diagrams that Vu presented because the waist of the notch was centered on the ground in such a way that it contained the radar site.

610.    In other words the closest part of the notch was exactly perpendicular to the azimuth of the missile.

611.    At the end of the presentation, Vu told Morgan to review this analysis with David Spetman, and assign Spetman the task of recalculating the Doppler Notch for a new set of threat trajectories.

612.    Vu told Morgan that Spetman was to work on this project as part of the Black Team support.

613.    Vu felt that Spetman would gain experience by using the Satellite Tool Kit software.

614.    Vu did not understand the error in his analysis, particularly as it related to the actual flight paths of real missiles, and the fixed value of the velocity vector.

615.    Morgan wanted to prevent SAIC from presenting such faulty science to the Government and prevent the waste of senior government and contractor staff time on an elementary mistake.

616.    Therefore, Morgan changed the topic by telling Vu that even if the analysis was correct, there were other ways to process data from the radar as the missile passed through the Doppler Notch.

617.    Morgan went so far as to warn Vu that SAIC would look foolish to recommend Radar basing on the argument of the Doppler Notch alone.

618.    Morgan also explained that Vu was making a "mountain out of a molehill" over the subject, and he risked exposing the superficiality of SAIC's work to the broader audience of the highly experienced Black Team.

619.    On the other hand, if Vu's objective was to train Spetman in the subject of ballistic missile flight, (which was not a contractual duty of the Black Team), Morgan nonetheless suggested to Vu that Spetman would be better served to

derive the actual Doppler Notch from "first principles", or in other words the defining geometry of the situation.

620. Morgan proposed that instead of using the software, he would work with Spetman to analyze the real problem mathematically, and this would give Spetman a deeper understanding of the geometry.

621. Satellite Tool Kit essentially uses the same mathematical procedures that Morgan was proposing to teach Spetman through this exercise.

622. When this effort would be completed Spetman would not just be using the computer routine blindly, he would instead understand what the analysis actually entailed.

623. Vu became incensed at the suggestion that there was an error in this analysis.

624. Morgan told Vu that it was simple matter to demonstrate and Morgan proposed to send Vu a memo with the vector analysis that showed that no Doppler Notch existed in the places that Vu claimed.

625. In order to do this Morgan planned on deriving a simple vector diagram that would allow him to take the vector "dot" product between the velocity vector of the missile and the radar signal that the radar transmitted to the missile.

626. This is a standard solution, usually assigned to undergraduates in engineering when they are sophomores or juniors.

627. Morgan planned to use a diagram from the textbook *Fundamentals of Astrodynamics* by Bate, Mueller and White.

628.    Spetman seemed eager to approach the problem this way and even mentioned that he had used the Bate, Mueller and White text in one of his undergraduate courses. He had the book on his bookshelf.

629.    Spetman held an undergraduate engineering degree and approximately five years of professional experience.

630.    Morgan borrowed the book from Spetman, created a diagram showing the orientation of the velocity vector and the radar signal vector from the radar site, and then calculated the "dot" vector product.

631.    The result showed, as expected, that the Doppler Notch waist could not be at a point directly perpendicular to the azimuth of the trajectory, as Vu had shown in one example.

632.    In order for Vu's construction to be correct, the missile would have to be flying parallel to the earth, or be located on the ground.

633.    The resulting memo also showed that for the true condition of Doppler blinding the notch would be located at an angle forward of the missile in the trajectory plane.

634.    This was the conclusion Morgan expected Spetman to derive in order to gain a "feel" for the geometry involved, before he blindly used a computer program.

635.    Vu rejected the memo.

636.    He claimed that Morgan did not consider Vu's variations in the velocity vector, which he said would allow for the blind spot to occur.

637.    This was an astonishing error for a senior SAIC scientific manager to make.

638.   It demonstrated that Vu had completely missed the point that one did not have arbitrary control over the selection of the missile velocity vector orientation.

639.   Vu again directed Morgan to assign the problem to Spetman as he had originally specified it (incorrectly).

640.   Several days later, Vu, Maile Fries, several members of the Blue Team and Morgan attended a working session with an engineer from Raytheon.

641.   Raytheon was responsible for siting the actual radar station under discussion as part of the Doppler Notch problem.

642.   During the meeting with Raytheon, Vu attempted to show what he claimed was SAIC's contribution to the selection of sites for the radar.

643.   He began to discuss his analysis of the Doppler Notch problem.

644.   Then he posed the same problem to the Raytheon engineer that he had proposed for Spetman.

645.   The engineer immediately told Vu that the Doppler Notch would not exist because at that point in the trajectory the missile would always have some component of velocity aimed upwards, which would be detectable.

646.   This is exactly the same point, stated a slightly different way, that Morgan had repeatedly made and explained in the original memo, and it was the reason he chose to use the "dot" product construction to prove it.

647.   With a vector dot product the angular components are particularly simple to work with and visualize.

648.   The upward component of velocity, which had to exist in a true trajectory, would prevent the vector "dot" product from ever becoming zero as was required in

order to make the cosine between the radar line-of-sight vector and the velocity vector become 90 degrees.

649.    The Raytheon engineer went on to say that even if Doppler Notching was a problem at this point in the trajectory, his signal processing algorithms could overcome the problem with "sequential lobing".

650.    Sequential lobing is the technique that Morgan was alluding to when he first told Vu that even if there was a Doppler Notch problem there was a better way to overcome it than siting the radar stations at different locations.

651.    About two weeks later, Vu seemed to digest all of this information and presented to SAIC MDA engineering group several diagrams that did show the waist of the Doppler Notch correctly located in front of the missile position at the burnout point.

652.    Morgan assumed from this presentation that, one way or another, Vu finally understood the problem and the issue would now be dropped.

653.    Instead, Vu said to Morgan that now that "he" (meaning Morgan) finally understood the problem, Morgan could properly assign it to Spetman to run with Satellite Tool Kit.

654.    Morgan discussed Vu's attempt to save face over this subject the next day with Bob Krancs a Mil-Tec employee who also worked in the division on the TSES account.

655.    Krancs had known Vu for twenty years and appreciated the humor in the situation.

656.    Krancs stated that one corrects Vu only at their own peril.

657.   This was another example of the fact that Vu and SAIC were well known within the MDA for mismanaging scientific problems and wasting the time of government and contractor scientists as a result.

658.   Still Morgan maintained in discussions with Vu that the best way for Spetman to help the Black Team, and MDA, was to derive the problem from first principles and carry it through to its completion.

659.   This would be a valuable learning exercise.

660.   Morgan then provided the final version of his memo to Spetman.

661.   The final version expanded the analysis to allow for a calculation of any angle between the velocity vector and the radar line-of-sight vector, and to determine where the angle intersected the ground.

662.   Vu got very angry and said that he would assign the problem to Spetman as a Satellite Took Kit exercise himself.

663.   Vu said he was not interested in the original derivation.

664.   At the same time, Vu set up a meeting for November 8th, 2004, about four weeks later, to show the results of Spetman's trajectory analysis to the Black Team core members.

665.   About a week before the scheduled meeting, Vu asked Morgan to look over Spetman's results from Satellite Tool Kit, and then, because Spetman would not be available, Vu wanted Morgan to present the analysis to the Black Team, instead.

666.   Morgan analyzed the results as directed and was dumbfounded.  When Vu told Spetman to run Satelite Tool Kit, he framed the problem by having Spetman work

with a "missile-fixed" coordinate system, rather than an earth-fixed coordinate system.

667. The problem with this analysis was that the coordinates Vu used depended on the geometric orientation of the missile, and not its velocity-based trajectory, to calculate the Doppler Notch.

668. This was a major failing in Vu's comprehension of the problem.

669. After he had set up the coordinate system this way, Vu then had Spetman run the analysis with the missile in several arbitrary geometric angular positions with respect to the flight path velocity vector. Vu called these positions the "angle of attack" of the missile at burnout.

670. Vu's comprehension of the problem was wrong on two counts.

671. Firstly, while it is possible for a missile to have a small angle of attack at burnout, it would not have angles as large as Vu indicated.

672. Secondly, the angle-of-attack velocity would have a negligible effect on the velocity vector and so would not affect the Doppler Notch in any event.

673. Vu had chose this particular way to frame the problem using arbitrarily prescribed angles-of-attack large enough that they included solutions that matched his original analyses that had the arbitrary choice of the "gamma" angle.

674. If anyone had ever compared the original presentation Vu made about the Doppler Notch to an analysis done properly, there would have been an obvious and wide discrepancy in the results but this analysis gave Vu some cover for his initial errors.

675.   Such a problem might prompt questions about the reasons for such discrepancies, and that, in turn, would lead to a discovery that Vu did not understand what was meant by flight path angle.

676.   But if the two analyses instead looked quite similar, then Vu could say that he had always meant "flight-path-angle" and "angle-of-attack" to mean the same thing, and any discrepancies between the two were only the result of semantics.

677.   By selecting large "angles-of-attack", for Spetman to run, Vu was able to make his earlier results look substantially similar to Spetman's new answers.

678.   Vu was knowingly assigning work to benefit his own repuration and wasting scientific effort in the process.

679.   There was even one case where the waist of the Doppler Notch again overlapped a point perpendicular to the azimuth of the trajectory.

680.   This was the very situation that had made Vu's analysis transparently incorrect in the first place, because the waist always has to lie in front of the missile along the trajectory azimuth for velocities on real trajectories as was proven mathematically in the original memo.

681.   However, Morgan knew that, the Raytheon engineer among others would understand why this was wrong, and could not simply let this matter be presented to the Black Team as Vu had stated it.

682.   In addition, Vu intended to use this analysis to inform Raytheon and MDA about locations on the ground that they must avoid when placing their radars at overseas sites.

683. Radar placement overseas is not only extremely costly it entails sensitive diplomatic negotiations.

684. In this case, Vu was knowingly prepared to provide the most senior scientific body within the MDA, the White Team, bad advice on how they should conduct expensive and delicate negotiations to site these radars.

685. Vu was going to do this in his capacity as a high-ranking officer of SAIC in spite of repeated warnings that his advice was not correct.

686. To prevent this Morgan prefaced the presentation to the "Core" Black Team by specifically stating that there were errors in the analysis, and that he did not stand behind the results that were being presented.

687. Vu's analysis failed in this instance because the "angle-of-attack" did not materially alter the vector "dot" product calculation, which was based on the true physical orientation of the velocity vector.

688. If one thinks about the underlying problem, it is apparent that any trajectory that goes from a launch point to an impact point must have a specific magnitude and direction in velocity to hit the intended point. ("direction" and "magnitude" are the two quantities that define a vector).

689. The particular geometric orientation of the object on any point in this trajectory does not alter this fact.

690. To give a real world example: if a golfer expects to hit a green from the tee, he must hit the ball with enough velocity, and with the proper elevation angle ("flight path angle") so that it flies in an arc between the point from which it is hit and the point on the green where the golfer wants to land it.

691. The orientation of the name painted on the ball, (the "body-fixed geometric axis") has no influence on this flight path.

692. The same philosophy applies to a ballistic missile. If Vu's "angle of attack" construction had any influence over the flight path angle (the orientation of the velocity vector) and velocity to hit a target then the missile would land at a variety of different impact points depending on the angle of attack at missile burnout. Or in the case of the golfer it would land at different points from the tee depending on the club that was used.

693. Very small changes in the geometric orientation of a warhead at release will make slight changes in the impact accuracy of the missile when some separation velocity is applied certainly, but Vu's "angle of attack" changes of 30 degrees, or so, produce changes in impact points that are far more than a few hundred meters of inaccuracy.

694. Instead, they lead to trajectories where the missile would land in the middle of the Pacific if it were launched from China to the United States.

695. Quite the contrary to Vu's interpretation, a missile has to be designed and flown in such a way that it can hit the target with a reasonable accuracy.

696. It has to go specifically from Beijing to San Francisco, say.

697. It may be true that at the end of the boost phase, the missile body is not specifically aligned with the velocity vector, but this has no influence over the direction, and the magnitude of the velocity vector, which must be fixed at that point for the warhead to hit its target.

698.    If Vu's angle-of-attack construction did have some influence over the final impact point, the missile would never hit its target.

699.    The Doppler Notch applies specifically to the warhead flight velocity vector, so one must use that velocity vector as the measure of it, and not the orientation vector.

700.    The geometric orientation of the long axis of the missile does not create the Doppler Notch, only the actual velocity vector of the warhead as it flies.

701.    During the presentation before the Black Team after Morgan indicated this point, Vu tried to cover his misinterpretation of the orientation of the warhead flight vector by saying that some velocity is added by the orientation of the missile because the warhead has to separate from the missile, and so there is slight separation velocity along the orientation axis.

702.    He argued that this is the velocity that will be detected as part of his "angle-of-attack" Doppler Notch analysis.

703.    This statement was equally specious and incorrect.

704.    It is true that there would be some separation velocity of the warhead from the missile body at the time the radar would be sensing the object.

705.    But that separation velocity would be about .010 kilometers/second (10 meters/second) by common agreement.

706.    The velocity vector, on the other hand, might be as high as 6.5 km/sec. Summed as vectors as shown in Figure 6, the small separation velocity barely nudges the 6.5 km/sec flight velocity. And this is, of course, reasonable considering the physical situation.

707.    If the separation velocity did change the flight path velocity, then again, the missile would wind up in the middle of the Pacific and not in the US.

708.    Upon his return from the meeting, Vu was livid with Morgan.

709.    He demanded that Morgan immediately explain why the angle-of-attack could not be used to change the Doppler Notch location.

710.    Vectors can be added diagrammatically and so Morgan went to Vu's whiteboard and showed him the vector diagram of the situation to scale.

711.    The vectors can be added by drawing the separation vector at the tip of the true velocity vector to scale.

712.    Morgan used the 30-degree angle of attack, which was the largest angle of attack that Vu showed in Spetman's presentation.

713.    The orientation velocity that is added is insignificant compared to the flight path velocity (in the third decimal place), and so it will not alter the results, for all practical purposes.  Vu had instead been showing charts to MDA officials that moved the Doppler Notch by hundreds of kilometers on the face of the earth.

714.    In reality, as described in figures accompanying this description, in the best of circumstances, the release (orientation) velocity might change the position by a few hundred feet (about the area covered by the radar site itself).

715.    Again, Morgan was troubled by Vu's presentation, because once again it proved Vu was not visualizing the situation correctly.

716.    When he saw the vectors to scale on his whiteboard Vu immediately grasped the point.  Then again, in what was clearly a face-saving ploy, he said that he had

never meant for the Doppler Notch analysis to be velocity-based in the first place and that he was really more interested in a different problem.

717.   The fact that Vu had started this whole problem with his misconception of the issue about velocity and persisted in issuing incorrect instructions to Spetman undercut this excuse.

718.   Vu, produced poor quality technical work, proved incapable of correcting mistakes once he made them, attempted to shift blame to people working below him and persisted in presenting work he had been warned was faulty.

719.   Additional complications might occur if a properly sited Radar did not produce enough power to detect the object as expected.

720.   Dr. Maile Fries regarded this issue as one of the major potential problems with the design of current radar systems and sensor plans, and she, her IDA Radar specialists and Morgan discussed it on several occasions.

721.   SAIC charged Vu with directing its scientific work in the Missile Defense Agency. This work was constantly reviewed within the Agency and Vu's failings as a scientific manager were well known.

722.   Vu discussed his initial analyses with the White Team as a means to aid that senior advisory body in selecting overseas locations for Raytheon's forward-based Radar systems.

723.   Examples of Vu's briefings are included in presentations made to the White Team on September 2nd and 3rd 2004, and believed by the Relator to be still resident at the Institute of Defense Analyses.

724.   SAIC also consumed the time of the White and Black teams during meetings on analyses that offered no benefit to the MDA.

725.   These meetings generally convened at least 20 people and sometimes as many as forty and lasted for two or three days.

726.   MDA held such joint meetings four or five times a year.

727.   The joint meetings also directed work for other members of the color coded groups and labor outside of these groups taking place in the engineering departments of MDA's industrial contactors.

728.   Several engineering staff members of these industrial engineering partners who were not part of the color-coded teams made presentations at the meetings.

729.   This extended the damages to the US Government beyond the simple time that SAIC billed the US Government for the staff time of its employees.

730.   The Plaintiff repeatedly complained to management both at SAIC and SPARTA, the prime contractor for SAIC relation with MDA, regarding the quality of the work performed.

731.   Nonetheless, SAIC continued to willfully and recklessly bill the Agency for work that it knew was not correct.

732.   It is apparent that SAIC abused the trust contemplated under the FAR for working on a Research and Development contract.

733.   That trust is articulated in Section 35.002 as follows:

The primary purpose of contracted R&D programs is to advance scientific and technical knowledge and apply that knowledge to the extent necessary to achieve agency and national goals. Unlike contracts for supplies and services, most R&D contracts are directed toward objectives for which the work or methods cannot be precisely described in advance. It is difficult to judge the

> probabilities of success or required effort for technical approaches, some of which offer little or no early assurance of full success. The contracting process shall be used to encourage the best sources from the scientific and industrial community to become involved in the program and must provide an environment in which the work can be pursued with reasonable flexibility and minimum administrative burden.

734. This provision makes clear that the quality of the science is supposed to come first in governemnt Research and Development contracts. SAIC abused that trust. It used the process for its own ends and produced poor scientific work in the process.

735. Damages to the United States as a result of Vu's direction on behalf of SAIC associated with ground based radar placement include, but are not limited to the wasted time and labor of the meetings convened to hear reports of SAIC's results.

736. The costs of those meetings were charged to the government approximately $35,000 a day in direct costs and approximately an equal amount in indirect costs related to setting up the meetings, ascertaining the clearances of all of the participants, lost direct labor while participants travel to the meeting site.

737. The annual cost of such Black/White team interactions, therefore is least $500,000 per year.

738. Damages also potentially include the cost of the labor and acquisition for about **$200 Million** per each instance of a mis-sited radar.

**L. Morgan Is Replaced On a Project and then Fired for Complaining about SAIC Business Practices.**

739. The allegations set forth in paragraphs 1-740 are hereby re-alleged and set forth fully as above.

740.    With his discovery of the defendants' fraudulent business practices, Morgan began to openly question their commitment to ethical and legal standards.

741.    He had already confronted Vu many times and he began to express his concerns to David Beerman, the SPARTA Contract Manager, as well.

742.    Then, in November of 2004, Beerman and Vu removed Morgan from work on a Threat System Engineering topic, assigned to Morgan, by the Missile Defense Agency National Team Chairman, Gordon Niva.

743.    This removal coincided with SAIC and SPARTA's refusal to allow Mr. Morgan to travel to meetings as Mr. Niva requested. (See Section E above.)

744.    Morgan complained to Vu and Beerman.

745.    He stated this action was unethical, because SAIC was withholding the services it had contracted with the MDA to perform.

746.    Moreover, he was uniquely qualified to perform the work because of direct experience on the subject going back over twenty years.

747.    When Morgan directly confronted Beerman and stated that the action was unethical and that work SAIC offered to the MDA was shoddy and substandard, Beerman told Morgan to keep this information "among our circle"…which Morgan interpreted at the time as meaning not to report it to the DoD Inspector General, or anyone else who could take action.

748.    After this oral notification, Morgan followed up in his weekly report with a note stating that he had been removed from a government assigned activity for reasons of SAIC billing.

749.    Vu directed Morgan to remove that statement from the report.

750.  As the date for the meeting neared, David Beerman wrote to Gordon Niva of the Missile Defense Agency stating that Morgan had been replaced by a junior engineer.

751.  Beerman gave no explanation for Morgan's replacement, thereby damaging Morgan's reputation.

752.  Morgan had personally briefed senior MDA personnel Gordon Niva and Denise DelCamp about his activities on the project and received their encouragement to continue.

753.  Those government employees would now expect Morgan would to explain why he had "been removed".

754.  In response, Morgan sent an email only to David Beerman, a circulation restriction of a single person, stating that SAIC's and SPARTA's assignments of his time amounted to fraud in managing its contract, and that SAIC was more interested in its employee bonus program than it was in providing the government with a legitimate service.

755.  Beerman showed the email to Bien Vu and Lee Phillips of SAIC.

756.  With only 60 minutes of warning, Lee Phillips of SAIC announced to Morgan that he was being fired.

757.  During this meeting Phillips told Morgan he could either immediately sign a resignation, or be fired.

758.  Phillips threatened that SAIC would damage Morgan's reputation in the community if he chose to be fired rather than resigning at once.

759. Phillips refused to discuss the matter beyond that, even as Morgan volunteered to review the FAR with Phillips that SAIC was violating.

760. Phillips delivered this message to Morgan and would not allow him to leave the room until he hand composed a resignation letter.

761. Morgan was not provided with counsel, nor was he allowed to make a phone call, or otherwise leave Phillip's presence for consultations until he wrote the note.

762. After Morgan signed the resignation under duress, he was put under guard and physically marched out of the building.

763. He was not allowed access to any of the documents he had been working on at SAIC, which were stored on his computer such as the memos referred to above.

## (FALSE CLAIMS ACT VIOLATIONS)

### COUNT I

764. The allegations contained in paragraphs 1-763 are hereby re-alleged and set forth fully as above.

765. The plaintiff has provided the government with evidence of the defendants' knowing, willful and reckless manipulation of personnel and budget proposals of the Missile Defense Agency.

766. The current budget for the Black Team was created by the defendants who claimed government authority they did not have in order to steer more business to themselves.  (*See,* for example, Statement of Facts Section B above.)

767. That budget put the defendants' concerns ahead of their duty to the MDA to produce proper science.

768. The current Black Team budget was created and accepted in a fraudulent manner, therefore all the costs and contracts charged to the government under this budget are fraudulent *ab initio*

769. As a result, the Missile Defense Agency has been damaged to the full extent of the Black Team budget of $2.825 million per year.

770. The current Black Team budget is in its second year of operation and charges to the United States under that budget continue.

771. The managers responsible for the current Black Team budget were also involved in contracts regarding previous Black Team budgets and contracts for all the color coded teams within the MDA.

772. On information and belief, the defendants conducted their budget and contracting procedures in the same manner for all activities in the MDA.

773. Furthermore the other color coded teams rely on the work of the Black Team and as a result, the work produced by the other color coded teams was compromised.

774. Therefore, damages to the United States Government include but are not limited to the full amount of the contracts and charges for the color coded teams or $12.4 million per year as well as Black Team Budgets as of their inception in 1999.

## **COUNT II**

775. The allegations contained in paragraphs 1-774 are hereby re-alleged and set forth fully as above.

776. The plaintiff has provided the government with evidence of the defendants' knowing willful and reckless manipulation of personnel and budget proposals within the Missile Defense Agency.

777.    The budget for the Black Team was created by contractors who claimed government authority they did not have in order to steer more business to themselves.

778.    Those budgets put contractors' concerns ahead of the concerns of the MDA and producing proper science.

779.    The budgets were designed to allow the defendants to charge high rates for less qualified personnel and they specifically used the line item "TSES various" to hide such personnel. (*See,* for example, Statement of Facts Sections B and C above)

780.    Damages to the United States include, but are not limited to the full value of this item in the Black Team budget of $575,000 per year.

781.    On information and belief, the defendants conducted their budget and contracting procedures in the same manner for all activities in the MDA.

782.    The contractors are subject to a fine of up to $10,000 for each instance, in which a less qualified person signed a time card or was assigned to handle work which should have been assigned to a senior scientist.

## COUNT III

783.    The allegations contained in paragraphs 1-782 are hereby re-alleged and set forth fully as above.

784.    Plaintiff has provided the government with evidence that defendant, SAIC, knowingly, willfully and recklessly, pressured an individual employee, Bruce Haselman, to switch from one contractor to SAIC in order to help the company

obtain business, and to control more personnel contracts. (*See* Statement of Facts Section D).

785. The contract for Mr. Haselman was obtained by SAIC through fraud in the inducement, therefore damages to the United States include, but are not limited to the full value of that contract or $350,000 per year.

786. This contract is ongoing and the damages to the United States are accruing as this complaint is filed.

787. On information and belief, the defendants manipulated individual employees to further their business goals on contracts throughout the MDA.

788. The defendants' actions manipulate employees in this manner was in restraint of trade and resulted in higher costs to the U.S. Government.

789. The defendants accomplished their goals through the wrongful assumption of governmental authority as well as intimidation of personnel.

790. Each instance of a time card or expense submitted, which fraudulently increases the cost to the United States is also subject to a fine of up to $10,000 under the False Claims Act.

## **COUNT IV**

791.  The allegations contained in paragraphs 1-790 are hereby re-alleged and set forth fully as above.

792. The plaintiff presented evidence that SAIC directed him to provide services for the benefit of the defendant SPARTA .

793. Morgan was assigned work for SPARTA's benefit on a TSES project to revise an Adversary's Capability Document even though SPARTA was not his employer. (*See* Statement of Facts Sections E and F)

794. Morgan was directed to charge this work to the Black Team account.

795. The Plaintiff first learned that the contract charges were not legally interchangeable, when a government official refused to authorize a trip based on the Black Team account.

796. The SAIC and SPARTA managers prevented Morgan from attending meetings the government requested, because they could not charge the Black Team Account and the TSES account was depleted.

797. The defendants' priority was to bill out all accounts fully rather than to complete the work required.

798. The defendants accessed a third account to have David Beerman, the SPARTA contract manager attend a meeting to provide the appearance of performing.

799. Beerman did not have appropriate scientific background to attend the meeting instead. (*See* Statement of Facts Section E.)

800. The use of contract funds as interchangeable which was a standard practice by SPARTA and SAIC, benefits only the contractors and prevents any real budgetary accounting or control of the expense of a project to the MDA.

801. The elaborate use of personnel to help defendants appear to be more productive with the MDA and to strengthen both defendants' position with the MDA was part of their effort to obtain business for themselves and prevent other contractors from obtaining business.

802.    As a result the United States has been damaged in an amount to be determined and subject to proof at trial for the inflation of costs on at least three contracts with the MDA namely the TSES contract the Black Team Contract and the third SPARTA contract accessed by Mr. Beerman.

803.    The United States has been damaged for charges made which were not appropriate to the contract charged.

804.    Such inappropriate charges indicate the contractors were billing out the full value of any contract without regard to the need for the work.

805.    Each instance of a time card or expense submitted which is charged against an inappropriate account thereby increases the cost to the United States.

806.    Each such charge is also subject to a fine of up to $10,000 under the False Claims Act.

## COUNT V

807.    The allegations set forth in paragraphs 1-806 are hereby re-alleged and set forth fully as above.

808.    The plaintiff has provided evidence of the practice commonly known as "resume baiting."

809.    The plaintiff's own resume was used in this manner to help SPARTA in the re-competition of its TSES contract.

810.    Both SAIC and SPARTA knew Morgan would not be available to work on the contract as bid, but presented his resume in the re-competition phase of the contract. (*See* Statement of Facts Section G)

811.    The United States has been damaged to the full value of the TSES contract or approximately $4 million per year as it was obtained through fraudulent use of Morgan's resume.

812.    On information and belief, both SPARTA and SAIC routinely engage in such practices throughout the MDA.

813.    This practice is inherently anti-competitive and is designed to deceive the US Government as to the qualifications of those who would conduct the work on a contract.

814.    As a direct and proximate result of the defendants' conduct in violation of the False Claims act the United States Government has been damaged to the full amount of any contracts obtained in this manner in an amount to be determined and subject to proof at trial.

## COUNT VI

815.    The allegations contained in the paragraphs 1-814 are hereby re-alleged and fully set forth as above.

816.    Plaintiff provided evidence that SAIC and SPARTA misrepresented the expenses needed to perform their contracts specifically to increase their profits at a cost to the United States. (*See*, Statement of Facts Section H)

817.    On information and belief the defendants follow this practice on contracts throughout the MDA.

818.    As a direct and proximate result of the defendants' conduct in violation of the False Claims Act the United States Government has been damaged in an amount

to be determined and subject to proof at trial for the value of contracts inflated by such expenses and obtained through fraudulent representation of expense costs.

819.    Furthermore, any incident of an expense submitted which would be in addition to the represented expense rate would be subject to a fine of up to $10,000 under the False Claims Act.

## COUNT VII

820.    The allegations contained in the paragraphs 1-819 are hereby re-alleged and fully set forth as above.

821.    The plaintiff provided evidence that SAIC charged Black Team accounts while knowingly, willfully and recklessly directing an employee to review undergraduate level textbooks solely to attempt to develop that employee's expertise as a marketing tool for the company. (*See* Statement of Facts Section I)

822.    The employee was hired and approved by the MDA to perform entirely different scientific work needed by the MDA in order to study this issue.

823.    The United States Government has been damaged to the full value of this employee's contract as he was directed to perform duties other than what he was hired to perform which were of no value to the MDA or $250,000 per year.

824.    Each incident of this employee's time card submitted is also subject to a fine of up to $10,000 under the False Claims Act.

825.    On information and belief, SAIC and SPARTA directed employees to charge for work and study issues to benefit the contractors rather than the work designated by the MDA on a regular basis.

826.    As a direct and proximate result of the defendants' actions in violation of the False Claims Act, The United States Government has been damaged in an amount to be determined and subject to proof at trial for work charged which is outside the area under which such personnel were hired.

827.    Each instance of a time card or expense charged for work not directed in such contracts is subject to a fine of up to $10,000 under the False Claims Act.

## COUNT VIII

828.    The allegations contained in the paragraphs 1-827 are hereby re-alleged and fully set forth as above.

829.    The Plaintiff provided evidence that SAIC and SPARTA knowingly, willfully and recklessly created a faulty work environment.

830.    The work environment encountered by the plaintiff did not properly support the personnel charged with conducting scientific work for the government, but was based on the priority of the defendants to maximize contract billing.

831.    As a direct and proximate result of this work environment, the defendant SAIC created an employee turnover rate which hindered scientific output and caused additional costs to the government.

832.    Damages to the United States for retraining workers as a result of the turnover rate are approximately $2.0 million per year.

833.    The work environment also hindered the work of the rest of the MDA community including other contractor personnel and government workers who work in an integrated fashion in the color coded teams.

834. Therefore, United States Government has been damaged to the full extent of the work conducted by the color coded teams or approximately $12.4 million per year.

### COUNT IX

835. The allegations contained in the paragraphs 1-834 are hereby re-alleged fully and set forth as above.

836. The plaintiff provided evidence that the defendants knowingly, recklessly and willfully pursued business practices which led to substandard scientific work produced for the MDA at government expense. (*See* Statement of Facts Section K.)

837. The work produced by the defendants should not have been acceptable to any subcontractor charged with providing scientific expertise to the MDA.

838. The United States has been damaged by the faulty science conducted as a result of the fraudulent management of these contracts.

839. The U.S. Government has been damaged by the time and effort used to create such poor science.

840. At least twelve meetings were conducted at which approximately 25 MDA consultants serving on color coded teams attended.

841. Each such consultant charges approximately $3,000 per day to review the faulty science cited by the plaintiff in the Statement of Facts Section K.

842. Therefore, damages to the United States for meetings to review science presented in reckless disregard for, or actual knowledge of, the unacceptable quality of the science presented, is at least $1.8 million during Mr. Morgan's tenure.

843. As a direct and proximate result of the defendants' actions in violation of the False Claims Act, The United States government has also been damaged in an amount to be determined and subject to proof at trial for the work required to correct such faulty scientific product.

## COUNT X

844. The allegations contained in the paragraphs 1-843 are hereby re-alleged fully and set forth as above.

845. The plaintiff provided evidence of four instances in which the defendants ordered poor scientific work be produced and the time to produce such work charged to the government with reckless disregard to the quality of the work produced.

846. The reckless disregard for the quality of the work led to faulty scientific work produced at government time and expense in each instance. (*See* Statement of Facts Section K)

847. In at least one of these instances the scientific project was continued despite the actual knowledge of at least one of the defendants that the science was incorrect. (*See*, Statement of Facts Section K, Example 3)

848. The work produced by the defendants in each of these cases should not have been acceptable to any subcontractor charged with providing scientific expertise to the MDA.

849. In at least one of these instances, false scientific work product was knowingly released to the MDA contracting community and relied upon to conduct work for procurement and testing, which can ultimately cost approximately $250 million.

850.   As a direct and proximate result of the defendants actions in violation of the False Claims Act, The United States has been damaged in an amount to be determined and subject to proof at trial for costs pursuant to missile tests, and procurement, which relied upon faulty science presented by the defendants.

## COUNT XI

851.   The allegations contained in the paragraphs 1-850 are hereby re-alleged fully and set forth as above.

852.   Plaintiff provided evidence that he was replaced on a project and then fired for complaining about SAIC's business practices. (*See* Statement of Facts Section L)

853.   The plaintiff has suffered employment related damages pursuant to 31 U.S.C Section 3730 (h) as he was fired for engaging in whistleblower activity.

854.   Furthermore, the US Government has been damaged in an amount to be determined and subject to proof at trial in that a senior scientist was removed from critical work for the MDA simply because he wanted to improve the quality of that work and prevent the company from engaging in fraudulent activity.

## COUNT XII

855.   The allegations contained in paragraphs 1-854 are hereby re-alleged fully as set forth above.

856.   Plaintiff has provided evidence that the defendants violated all or part of Federal Acquisition Regulations including, but not limited to, the following sections:

2.101; 3.101; 3.3; 3.301; 3.5; 3.501; 3.501-1; 3.501-2; 3.503; 3.503-1; 3.9; 3.901; 7.500; 7.503; 31.2; 31.201-1; 31.201-2; 31.201-3; 31.201-4; 35.002; 37.5; 37.501; 37.504; 42.7; 42.702; 42.703; 42.703-1; 42.703-2; 42.707; 46.2;

46.201; 46.202-2; 46.202-4; 50.203; 52.2;  52.203-2 52.212-5; 52.222-46;

857.    Adherence to the FAR in contracting procedure is required.

858.    The United States government has been damaged to the full extent of any contract

obtained or performed in violation of the FAR.

859.    Furthermore the United States Government has an interest in ensuring contracting

procedures follow its appropriate regulations.

860.    The Defendants demonstrated contempt for the FAR and for the law governing

U.S. contracting in their handling of contracts with the MDA.

861.    The United States has been damaged to the extent that the FAR have been

damaged when contractors can evade them with impunity.

862.    Each incident of a violation of the FAR is punishable under the False Claims Act

by a Fine of up to $10,000.

## **PRAYER FOR RELIEF**

Wherefore, Thomas O'Neil Morgan on behalf of himself and the United States

Government prays:

a)    That Relator/Plaintiff be awarded all relief necessary to make him whole,

pursuant to U.S.C 31 Section 3730 subsection (h) as a result of his special

damages including, but not limited to physical pain and suffering, and financial

damages to be determined at trial as a result of his engaging in protected activity.

b)    That Relator/Plaintiff be awarded all reasonable attorneys fees and costs, pursuant

to 31 U.S.C. Section 3730 subsection (d) (1) (b) and subsection (d) (2).

c)    That this Court enter a judgment against defendants in an amount equal to three

times the amount of damages the United States Government has sustained

because of defendants' misrepresentations and fraudulent practices in creating budgets to obtain their own contracting business and any other false claims the defendants made pursuant to work contracted  with agencies of the U.S. Government.

d) That this Court enter a judgment against defendants in an amount equal to three times the amount awarded to the defendants under the contracts for personnel and expenses on behalf of the MDA;

f) That this Court enter a judgment against the defendants in an amount equal to three times the amount of the damages created by the defendants as a result of their business practices which created faulty science compromising procurement and testing by the MDA.

g) That this court enter a civil penalty for of $5,000 to $10,000 for each violation of 31 U.S.C. section 3729, including each individual violation of the FAR by the defendants, each fraudulently presented individual time card or expense or allocation from incorrect contract charged by the defendants to the MDA.

h) That Relator/Plaintiff be awarded punitive damages in an amount to be determined by jury, which shall dissuade the defendant and others from similar action;

i) That the Relator/Plaintiff be awarded all costs incurred including reasonable attorney's fees;

j)      That in the event the United States Government continues to proceed with this action, the Relator/Plaintiff be awarded an amount for bringing this action of at least 15% but not more than 25% of the proceeds of the actions or the settlement of the claim;

k)      That in the event that the United States Government does not proceed with this action, the Relator/Plaintiff be awarded an amount that the Court decides is reasonable for collecting the civil penalty and damages, which shall be not less than 25% nor more than 35% of the proceeds of the action or settlement;

l)      That the Relator/Plaintiff be awarded pre-judgment and post judgment interest;

m)      That a trial by jury be held on all issues;

n)      That the United States Government and the Relator/Plaintiff receive all relief both at law and at equity, to which they may reasonably appear to be entitled.

**JURY TRIAL DEMANDED**

Respectfully Submitted,

_____

Stephen M. Kohn

DC Bar No. 411513

Michael D. Kohn

DC Bar No.425617

David Colapinto

DC Bar No. 416390

Kohn, Kohn & Colapinto, LLP

3233 P. Street N.W.

Washington D.C. 20007

(202)-342-6980

(202)-342-6984 (fax)

Attorneys for Thomas O'Neil Morgan

**JURY TRIAL DEMANDED**

September 2, 2005